UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF:

JOSHUA ADAM KAPLAN

Chapter 7
Case No. 25−48523−tjt
Hon. Thomas J. Tucker

Debtor.

_____/

**DEBTOR'S RESPONSE TO ZB VERIFIED INVESTMENTS LLC'S MOTION FOR ENTRY OF ORDER DIRECTING PRODUCTION OF DOCUMENTS AND ORAL EXAMINATION OF DEBTOR, JOSHUA ADAM KAPLAN**

NOW COMES Joshua Adam Kaplan ("Debtor"), by and through his attorneys, OSIPOV BIGELMAN, P.C., and for his response to ZB Verified Investments LLC's Motion for Order Directing Production of Documents and Oral Examination of Debtor, Joshua Adam Kaplan (the "Motion"), states as follows:

1. Admit, as true.

2. Admit, as true.

3. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

4. Admit, as true.

5. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

6. Admit, as true.

7. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

8. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

9. Admit, as true.

10. Denied, as untrue.

11. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

12. No response required.

13. No response required.

14. No response required.

15. No response required.

16. Denied, as untrue.

17. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

18. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

19. Denied, as untrue.

20. Neither admit nor deny for lack of knowledge or information upon which to form a belief as to the truth of the matter.

**Brief in Response**

Divided Sky, LLC was formed on April 17, 2023. The Debtor has a membership interest in Divided Sky, LLC. The movant's interest in this case concerns a loan made by the movant to Divided Sky, LLC on or about April 27, 2023, that was guaranteed by the Debtor. There is pending litigation involving the loan and guaranty in Oakland County Circuit Court in a case captioned <u>ZB</u>

<u>Verified Investments, LLC v Adam Kessler, et al</u>., Case #24-207081-CB ("State Court Litigation").

**Exhibit A**.  This litigation also involves other companies owned by the Debtor including Supply Line International, LLC ("SLI") and Supply Line International Medical, LLC.  The movant is also tangentially involved in an arbitration involving Divided Sky, LLC that may net the movant a substantial recovery.  <u>Divided Sky, LLC et al v Orchard Laboratories Corp et al</u>, JAMS Arbitration Case #5345000501.

In its motion, the movant twice stated its intention to bring an Adversary Proceeding against the Debtor, stating that:

¶8.  "ZB may also have potential nondischargeability claims against Debtor for which it requires investigation of Debtor's books and records."

¶18.  "This range of records is necessary for ZB to ascertain its rights and remedies in this bankruptcy proceeding including whether <u>additional grounds exist</u> to oppose the dischargeability of its claims against Debtor." (Emphasis added).

As such, there is at least one pending proceeding involving the Debtor, his companies, and the movant.  Based on the statements of the movant in its Motion, there will soon be a second pending proceeding.

The Debtor attempted to resolve these document requests prior to the filing of the Motion, however, the movant refused to address the Debtor's concerns such as temporal scope, relevance, the reasonableness of the request, and the fact that the Debtor is not in possession of many of the requested documents, as they are in the possession of the receiver for SLI.  Access to the Debtor's information on the server is currently the subject of a motion pending before this Court.  ECF No. 48.  **Exhibit B**.

The movant's proposed order lists 21 categories of documents requested by the movant. **Exhibit 6-C**. The movant's request is violative of the pending proceeding rule. The categories of documents include, but are not limited to; seeking Divided Sky, LLC's and the Debtor's income tax returns (¶1), financial statements (¶4), loan documents (¶5-6), financial account records (¶7), payment records (¶9), litigation records (¶10), real estate records (¶11), corporate book and records(¶12), credit card statements (¶13), ownership of internet of domains or URLs (¶15), intellectual property (¶16), payments or transfers (¶19), documents evidencing payments or transfers by Orchard Laboratories to the Debtor (¶20), and all documents evidencing payments or transfers by SLI to Debtor (¶21). Many of these requests have no defined temporal scope at all. Clearly, this request is being made to circumvent the discovery rules of the State Court Litigation.

**Even worse**, the movant is attempting to obtain these documents after Oakland County Circuit Court Business Court Judge Warren twice denied their overly broad discovery requests in two failed motions to compel discovery. **Exhibits E, F,** and **G[1]**. The Pending Proceeding Rule is grounded in the principle that a litigant should not use Bankruptcy Rule 2004 to **circumvent the rules** or limitations of an already-pending judicial proceeding. The movant is shamelessly attempting to circumvent two rulings denying their discovery requests in the State Court Litigation.

The movant also seeks at ¶8 of the proposed order "All of Debtor's bank, credit union, loan association or similar institution statements and cancelled checks for accounts titled solely in his name or on which Debtor is an account holder for **2020**-current (even if such accounts were closed on a date earlier than the Petition Date), with the exception of statements for the Chase Bank account ending in 9188". The temporal scope of this request is improper, irrelevant and unduly

---

[1] In its Order Denying Plaintiff's Second Motion to Compel Discovery (**Exhibit G**), the Court incorporated by reference the reasons articulated in the Defendant's response for its basis to deny the motion. The response is **Exhibit F**.

burdensome as the loan and guaranty at issue was made on or about April 27, 2023. Similarly, the movant at ¶14 of the proposed order requests "All employment agreements including agreements or communications regarding Debtor's employment compensation for any entity or person that employed Debtor for **2020** through the Petition Date." This request is objectionable for the same reasons.

**Applicable Law**

The "pending proceeding" rule states "that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to [Federal Rules of Bankruptcy Procedure 7026-7037], rather than by a [Rule] 2004 examination." *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996). *See also In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (2004 examination cannot be used to bypass the discovery rules in a pending adversary proceeding); *2435 Plainfield Avenue, Inc. v. Township of Scotch Plains (In re 2435 Plainfield Ave., Inc.*), 223 B.R. 440, 455-56 (Bankr. D.N.J. 1998) (collecting cases on the pending proceeding rule); *Intercontinental Enters., Inc. v. Keller (In re Blinder, Robinson & Co., Inc.)*, 127 B.R. 267, 274 (D. Colo. 1991) (similar). <u>In addition to restricting the use of Rule 2004 examinations when proceedings are pending against the examinee in the bankruptcy court, courts have also recognized that Rule 2004 examinations may be inappropriate "where the party requesting the Rule 2004 examination could benefit their pending litigation outside of the bankruptcy court against the proposed Rule 2004 examinee.</u>" *Enron*, 281 B.R. at 842. *See also Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), *aff'd [*12]* 52 F.3d 1067, 1995 WL 231797 (5th Cir. 1995) (table decision) (characterizing the use of Rule 2004 to further a state court action as an abuse of Rule 2004 and stating that the bankruptcy court did not abuse its discretion by denying production under a subpoena issued under Rule 2004. *In re Washington Mut., Inc.*,

408 B.R. 45, 50 (Bankr. D. Del. 2009) (Rule 2004 not to be used for litigation outside the bankruptcy court). *See also Sec. Investor Protection Corp. v. Continental Capital Inv. Svcs. (In re Continental Capital Inv. Svcs.)*, No. 03-3370, 2009 Bankr. LEXIS 1450, 2009 WL 1604703, at *4-5 (Bankr. N.D. Ohio March 6, 2009) (2004 examination was overbroad when law firm challenging the 2004 examination was subject to a SIPA adversary action).

A Rule 2004 examination may not be used to obtain discovery of evidence for any pending adversary proceeding or other litigation even if it is through an examination of an entity which is not a party to or affected by the pending litigation. Under those circumstances, the discovery provisions of the Federal Rules of Civil Procedure are to be used. *In re Wash. Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009); *Sweetland v. Szadkowski (In re Szadkowski)*, 198 B.R. 140, 142 (Bankr. D. Md. 1996). When there is pending litigation, Rule 2004 examinations may not be used to circumvent the discovery rules provided in the Federal Rules of Civil Procedure. *In re GYPC, Inc.*, No. 17-31030, 2020 Bankr. LEXIS 1848, at *11-13 (Bankr. S.D. Ohio June 24, 2020)

### Discussion

Movant is seeking to use Fed. Bankr. R 2004 to circumvent the discovery rules of the State Court Litigation, and to take pre-discovery of the adversary proceeding that they threatened in their motion. As such, the movant's request for documents in the proposed order at ¶¶ 1,4-7, 9-13, 15-16, and 19-21 should be denied.

Also, the request for documents in the proposed order at ¶¶8 and 14 which seek documents going back to 2020 should be denied because the parties did not transact business until April 27, 2023. Additionally, requesting over five years of bank statements, cancelled checks,

communications, employment agreements is improper, irrelevant and unduly burdensome as the loan and guaranty at issue was made on or about April 27, 2023.

Finally, the request for documents in the proposed order at ¶¶ 5, 9, 11, 15, 16, 19, 20, and 21 in the proposed order with no defined temporal scope should be denied.

The Debtor has no objection producing documents requested in the proposed order at ¶¶2, 3, 17, and 18 to the extent that they are in his possession, custody, or control.

If the Court is inclined to grant the request for other documents in the proposed order, the Court must be cognizant that the Debtor does not have possession, custody, or control of most of the documents requested due to the server being seized by the state court receiver. ECF No. 52

The movant received notice of this case within three days of the Debtor's bankruptcy filing (if not sooner), as the Debtor filed a notice of automatic stay in the State Court Lawsuit. **Exhibit D.** Despite receiving immediate notice, the movant waited at least 66 days to file the present motion. As such, it is likely that the movant will have filed an adversary proceeding before an examination takes place, making this entire request moot.

**WHEREFORE**, for the reasons stated herein, the requests from the movant should be denied.

Respectfully submitted,

**OSIPOV BIGELMAN, P.C.**

DATED: November 13, 2025

*/s/ Jeffrey H. Bigelman*
JEFFREY H. BIGELMAN (P61755)
Attorneys for Debtor
20700 Civic Center Drive, Suite 420
Southfield, MI 48076
Tel: 248-663-1800/Fax: 248-663-1801
jhb@osbig.com

# Exhibit A

ZB VERIFIED INVESTMENTS LLC,

                                          Case No. 24-207081-CB

          Plaintiff,                       Hon. Michael Warren

v.

ADAM KESSLER; JOSHUA KAPLAN[1];
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

          Defendants.

---

| | |
|---|---|
| Ethan R. Holtz (P71884) | Thomas W. Cranmer (P25252) |
| Emily M. Mayer (P78956) | Caroline Giordano (P76658) |
| Taft Stettinius & Hollister LLP | Kimberly L. Scott (P69706) |
| 27777 Franklin Road, Suite 2500 | Miller, Canfield, Paddock and Stone, PLC |
| Southfield, MI 48034 | 840 West Long Lake Road, Suite 150 |
| (248) 351-3000 | Troy, MI 48098 |
| eholtz@taftlaw.com | (248) 879-2000 |
| emayer@taftlaw.com | cranmer@millercanfield.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendants Kessler, Kaplan,* |
| | *Divided Sky, LLC, and Supply Line* |
| | *International, LLC* |
| | |
| | Kelly E. Kane (P81912) |
| | Callan G. Stein (Admitted PHV) |
| | Michael Lowe (Admitted PHV) |
| | Troutman Pepper Hamilton Sanders LLP |
| | 4000 Town Center, Suite 1800 |
| | Southfield, MI 48075 |
| | (248) 359-7300 |
| | kelly.kane@troutman.com |
| | callan.stein@troutman.com |
| | Michael.lowe@troutman.com |
| | *Attorneys for Defendant Sami Ahmad* |

---

## SECOND AMENDED COMPLAINT

---

[1] Claims against Kaplan are administratively stayed due to pending voluntary bankruptcy filing pursuant to chapter 7 of Title 11, United States Code, Section 101 *et seq.* (the "Bankruptcy Code").

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Plaintiff ZB Verified Investments LLC (the "ZB"), through its attorneys, Taft Stettinius & Hollister LLP, alleges the following for its Second Amended Complaint against Defendants Adam Kessler ("Kessler"), Joshua Kaplan[2] ("Kaplan"), Divided Sky, LLC ("DSLLC") Supply Line International Medical, LLC ("SLIM"), Supply Line International, LLC ("Supply") (Kessler, DSLLC, SLIM and Supply are herein after referred to as the "Kessler Defendants"), and Sami Ahmad ("Ahmad") (the Kessler Defendants and Ahmad are collectively, the "Defendants"):

## PARTIES, JURISDICTION, AND VENUE

1.      ZB is a Michigan limited liability company whose principal place of business is in Oakland County.

2.      Kessler is an individual who resides in Oakland County.

3.      Kaplan is an individual who resides in Oakland County.

4.      Ahmad is an individual, who upon information and belief, resides in Oakland County.

5.      DSLLC is a Michigan limited liability company whose principal place of business is in Oakland County.

6.      Supply is a Michigan limited liability company whose principal place of business is in Oakland County.

7.      SLIM is a Michigan limited liability company whose principal place of business is in Oakland County.

8.      Kaplan is the manager of DSLLC, Supply, and SLIM.

9.      This Court has jurisdiction over the parties pursuant to MCL 600.701 and 600.731.

---

[2] ZB identifies Kaplan in name only and this Amended Complaint is not intended as the commencement or continuation of this action as against Kaplan. Claims against Kaplan are reserved until such time as the bankruptcy action is resolved.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

10.     Venue is proper in this Court pursuant to MCL 600.1621.

## STATEMENT OF FACTS

11.     In or about April of 2023, DSLLC's principals Kessler and Kaplan approached ZB's principals, independently, with what they termed was a unique investment opportunity.

12.     Kessler and Kaplan explained to ZB's principals that they had been operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare and were offering an investment opportunity therein.

13.     Kessler and Kaplan advertised their business as a "direct to consumer program paid for by the United States Federal Government."

14.     Kessler and Kaplans' offering materials, provided to ZB's principals in order to induce them to invest (the "Offering"), described the participants in the opportunity as follows:

> **Supply Line International Medical** ("SLI") has used its successful supply chain partners to obtain direct relationships to testing manufacturers and has been one of the largest suppliers of COVID testing to states and hospitals throughout the pandemic (the supplier).
>
> **[The Laboratory ("Laboratory")]** is one of the largest independently owned labs in the Midwest and the first independent lab in Michigan to offer COVID testing. [The Laboratory] is serving the nation with a multitude of testing types and screening services (the CLIA lab).
>
> **Verified Health** ("VH") is an innovative, homegrown SAAS tool to manage patient care and testing. A joint venture co-founded by the owners of SLI and [The Laboratory], along with industry leading healthcare developers (the technology delivery tool).

15.     The Offering further explained that,

> Pursuant to the Families First coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), during the Public Health Emergency ("PHE") those Recipients have the right to, receive COVID-19 OTC tests at zero cost to the subscriber. Specifically, Medicare

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Recipients are authorized to receive 8 COVID-19 tests per month, every month, until the PHE ends, which is currently set to end on May 11, 2023. While for most Medicare Recipients covid testing will be subject to cost-sharing (deductible and Co-Pay) after the end of the PHE, there is a minimum one (1) year wind down provision of the FFCRA and CARES for Medicaid Recipients, which will continue in to September of 2024. The directive to Medicaid is to ensure lower income families have access to preventative testing and to prevent outbreaks of COVID-19 that spawn hot zones throughout the country.

[The Laboratory] using Verified Health's customer relationship manager platform has been garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023. To date, the venture has generated more than 150,000 subscriptions. Going forward, the opportunity for Medicaid is even greater, because of the longer lasting nature of the program – it goes until September 2024. Recipients are coming to the platform via online marketing campaigns and TV advertisements. The cost of advertising is roughly $750,000.00 per day. While this seems like a significant outlay the per Subscriber cost breaks down to about $35.00 per subscription and is covered in just the first shipment. Below are the costs and revenue associated for a single subscription.

| **Costs** | | **Profit** | |
|-----------|--------|----------------------|-------------------------------|
| COGS | $12.80 | Reimbursement | $11.75/per test |
| Advertising | $35.00 | | |
| Pick/Pack/Ship | $10.00 | | |
| Platform | $8.00 | | |
| Postage | $0.90 | | |
| Billing | $4.70 | | |
| Insurance | $0.60 | | |
| Total Expense | $72.00 | 8 Tests Reimbursement | $94.00 Subscriber per month |

When a Recipient opts in - the profit goes up because cost of advertising, postage, and insurance discovery is removed from the refill bringing the profit per Subscriber to $35.50 a 62% profit margin per shipment. An opt in by just 1 percent of Medicaid Recipients is over 900,000 Subscribers which if each Subscriber opted in for at least 6 months generates revenue of over 500 million dollars.

16.     As described above and by Kaplan and Kessler, SLIM would obtain the COVID-

19 test kits from its supply chain connections, VH owned and operated a website through which

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

consumers could apply for and register to receive the tests, and DSLLC would provide the management and marketing to drive consumers to VH's website to register for the tests, thus creating the opportunity to be reimbursed and paid by the US Government.

17. The Laboratory played a critical role in the business, as The Laboratory is an approved Medicare/Medicaid biller and the business could not operate and/or participate in the program to receive reimbursement from the US Government without an approved Medicare/Medicaid biller.

18. As represented by Kessler and Kaplan and understood by ZB's principals at the time (although they were never provided a copy), DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business.

19. As also described above, Kaplan and Kessler told ZB's principals there was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023.

20. But, Kaplan and Kessler touted that after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

21. Kaplan and Kessler explained that the business had been highly successful in driving subscribers to VH's website using a technique called "affiliate marketing."

22. Kaplan and Kessler explained affiliate marketing as "a performance-based marketing strategy in which an investor () rewards affiliates () for driving traffic or sales to their website or product…the merchant provides the affiliate with a unique affiliate link or code, which

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the affiliate then promotes to their audience, such as on their website, blog, social media, or native advertising platform. When a user clicks on the affiliate link and makes purchase, the affiliate earns a commission from the merchant."

23. Kessler described this method of marketing as highly successful, and highly expensive.

24. ZB has since learned that Kessler and Kaplan proposed this performance-based method of marketing to The Laboratory, who definitively told them they could not and were not authorized to market in that manner.

25. Indeed, Kaplan and Kessler represented that they were spending in excess of $750,000 per day on affiliate marketing.

26. Kaplan and Kessler further explained that while their business was highly successful and had generated millions of dollars of revenue in the short time in which they were operating, the US Government's pace of reimbursement did not keep pace with their cash demands and thus they needed a "bridge" to continue marketing until they received their monies from the US Government, via The Laboratory.

27. That is where, Kaplan and Kessler offered, ZB could enter the picture.

28. Specifically, if ZB were to provide DSLLC a sizeable loan that DSLLC would use for marketing (so they were told), DSLLC would agree to repay that loan at very favorable terms.

29. Moreover, as an added incentive to provide funding, Kaplan and Kessler offered ZB a 1% membership interest in VH for each $2 million that ZB was able loan to DSLLC.

30. ZB decided to take their offer.

**The Loan and Loan Documents**

31. On or about April 27, 2023, ZB loaned DSLLC $4,850,000.00 (the "Loan"),

evidenced by a Promissory Note, effective as of that date, executed by DSLLC in favor of ZB (the "Note"). A copy of the Note is attached hereto as **Exhibit 1**.

32.     The Note provides that the Loan would bear interest at a rate of twenty (20%) percent per annum and that DSLLC was required to make payments of interest on the first day of each month following the effective date thereof. Ex 1.

33.     The Note further provides that the Loan would fully mature and that all unpaid principal and interest would become fully due and payable on or about twelve (12) months from the date of the effective date - - April 27, 2024 (the "Maturity Date"). Ex 1.

34.     However, the Note also provided an option to ZB, "…at any time after the ninetieth (90th) day after the Effective Date, the Lender may accelerate the Maturity Date to a date selected by the Lender upon sending at least twenty-one (21) days prior written notice to Borrower and the date set forth in the notice form Lender to Borrower shall become the Maturity Date of this Loan…" (the "Acceleration Option").

35.     Upon any default and/or failure to pay amounts due at any time, including but not limited to the Maturity Date, the Note provides that the Loan shall bear default interest at a rate of an additional three (3%) percent until cured ("Default Interest").

36.     In the event that DSLLC failed to pay any amounts due pursuant to the Note, DSLLC further agreed in the Note to pay all costs of collection, including but not limited to reasonable attorney's fees incurred by ZB. Ex 1.

37.     Upon a default or failure to pay amounts due pursuant to the Note, all amounts due and payable are owed, "without notices, presentation or demand for payment, all such being hereby waived by [DSLLC]…" Ex 1.

38.     The Note further required DSLLC to provide ZB with financial statements, balance

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

sheets and any other financial information ZB requested from time to time. Ex 1.

39.    Finally, it was "acknowledged and agreed" between ZB, DSLLC and Supply, that the Loan was to be paid directly by ZB to Supply, rather than DSLLC, and Supply acknowledged receipt of same by its signature. Ex 1.

40.    As an inducement to enter the Loan and to secure repayment thereof, as of April 27, 2023, each of Kessler, Kaplan, and Ahmad (the "Guarantors") entered into personal "Guaranties" in favor of ZB, by which they agreed to personal liability for all amounts due pursuant to the Note and provided certain representations and warranties (the "Guaranties"). **Exhibit 2**.

41.    Pursuant the Guaranties, the Guarantors

> …Jointly and severally, unconditionally and irrevocably guarantees to [ZB] the full and prompt payment when due of all indebtedness, liabilities and obligations of [DSLLC] to [ZB] howsoever evidenced, governed and/or secured, whether present or future, primary or secondary, absolute or contingent, direct or indirect, several, joint or joint and several (collectively, "Indebtedness"), together with out-of-pocket and reasonable expenses, costs and attorney's fees, incurred by [ZB] in connection with the enforcement of this Guaranty and/or any obligations of the Borrowers to Lenders arising under the Loan Documents. Lender may have immediate recourse against Guarantor for full and immediate payment of the Indebtedness at any time when the Indebtedness, or any portion, has not been paid when due (whether by acceleration or otherwise) and after expiration of all applicable notice and cure periods…Guarantor's obligations under this Guaranty are **UNLIMITED**….

42.    Paragraph 2 of the Guaranties further provide that "Guarantor's liability for payment of the Indebtedness shall be a primary obligation and shall be absolute and unconditional…The obligations set forth in this Guaranty constitute full recourse obligations of the Guarantor, enforceable against each party comprising Guarantor to the full extent of such party's assets and properties…"

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

8

43.     Pursuant to Paragraph 3 of the Guaranties, each Guarantor expressly and unconditionally waived, among other things, "…(c) any setoffs or counterclaims against [ZB] which would otherwise impair [ZB's] rights against Guarantor; (d) any demand or notice of any action that Lender takes regarding any Borrower, anyone else, any collateral or any Indebtedness, which guarantor might be entitled to by law or under any other agreement…"

44.     Pursuant to Paragraph 4 of the Guaranties, each Guarantor represented and warranted to ZB that, among other things: "…(d) Such Guarantor shall certify and furnish to Lender those financial reports and information required pursuant to the terms of the Loan Documents…(e) that at the time of execution and delivery of this Guaranty, and as long as the Guaranty is in effect, each Guarantor has minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is in assets solely in the name of each Guarantor..."

45.     Upon execution of the Note and Guaranties, ZB disbursed $4,850,000 to Supply as provided by the Note.

**Kessler and Kaplan Lie to ZB About the Success of the Business**

46.     Almost immediately, ZB began to ask Kessler and Kaplan for updates about the performance of DSLLC's business.

47.     Kessler and Kaplan continually replied with statements that the program was performing extremely well. For example:

a.  On April 25, 2023 at 8:40 AM, Kessler wrote to that "4,239 opt ins so far today…Not even 9:00am."

b.  On May 5, 2023, ZB asked Kessler how the numbers have been and if ZB could receive weekly/monthly/quarterly updates. Kessler responded, "Quarterly updates work. Haven't' put big heat on Medicaid yet, trying to wrap up Medicare. We've lowered marketing spend but are still getting 5k per day of Medicare. Total April was 300k. Got $5M yesterday as first big payment from

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Medicare."

   c.   On May 30, 2023, ZB asked Kessler for another update and "When do you think you will start executing on the Medicaid program." In response Kessler wrote, "We started soft launch of Medicare[sic] – very small – to test some new features out. We've collected about $20m and expect another $22m in this week. *Medicaid."

   d.   May 30, 2023 when asked why DSLLC had not deployed capital for Medicaid for yet, Kessler responded "Well we haven't deployed the capital from the receivables for Medicaid yet because we are in the process of testing out new features on the website, testing marketing channels, and confirming various insurance procedures for the respective states."

   e.   On June 26, 2023 ZB requested an update call. On June 27, 2023, the parties had a zoom call wherein Kessler assured ZB, in substance, that the business was performing incredibly well.

   f.   On July 5, 2023, Kaplan sent ZB a memo representing the following:

      i.   "From March of 2023 until the FHE was lifted, approximately 350,000 Medicare recipients signed up to receive Tests of which roughly 300,00 received at least 2 shipments. During the program, The Laboratory dispensed more than 5,000,000 Tests. CMS has requested some additional information from The Laboratory for roughly 70 patients (out of 400,000 since the Program's inception) which we have provided…During the Program, Verified Health exceeded its revenue projections."

      ii.   "…Due to the increased risk resulting from multiple payers, The Laboratory has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state, to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks. We are excited with the results to date."

   g.   Attached to that same memo, Kaplan sent a "Project Income Statement" which claimed more than $61 million in revenue and $21 million in net income.

48.     Unfortunately, after filing this lawsuit, ZB discovered that most, if not all of the above representations were knowingly false when made and/or omitted critical material facts that would them not misleading/misrepresentations.

49.     Indeed, from the date of the Loan until late March or early April of 2024, Kessler/Kaplan did not disclose any issues with DSLLC's business.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

50.     Rather, between June 29, 2023 and April 4, 2024, DSLLC made payments of interest only, to ZB totaling $926,888.88, although many of those payments were late, ZB assumed that DSLLC was returning money and the Loan would be paid in full.

51.     During that time, as the Loan neared the Maturity Date, ZB made several requests to DSLLC for financial and other reasonable information concerning DSLLC's ability to repay, which DSLLC failed to provide in breach of the Note and causing Default Interest to accrue.

52.     In or about March or early April of 2024, Kessler disclosed to ZB that the US government had initiated an audit of DSLLC/The Laboratory's claims for reimbursement and was withholding payment of monies due.

53.     As a result thereof, Kessler/Kaplan informed ZB that DSLLC would not be able to pay the balance of the of the Loan upon maturity.

54.     Kessler/Kaplan however, assured ZB that there was nothing wrong, all claims submitted were legitimate, and the audit was simply "routine" and as a result of errors made by DSLLC's third-party shipper.

55.     Kessler/Kaplan told ZB the matter was simply an issue of "timing" and the government was going to pay The Laboratory, who in turn would pay ZB.

56.     Kessler/Kaplan told ZB that DSLLC is owed more than $21 million, perhaps as much $30 million by The Laboratory.

57.     These representations would turn out to be false and known to be so when made.

**The Loan Maturity and Lawsuit**

58.     DSLLC did not make any payments toward the principal or interest on the Loan after April 4, 2024.

59.     Pursuant to the Note, all principal and interest due on the Loan fully matured on the

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Maturity Date and were immediately due and payable as of Maturity Date.

60.     As of the Maturity Date, the entire principal amount of the Note of $4,850,000, a monthly interest payment of $43,111.11 and accrued Default Interest were outstanding, due and payable.

61.     DSLLC breached the Note by failing to repay the entire amount due and payable as of the Maturity Date in the amount of at least $4,893,111.12 plus accrued Default Interest.

62.     As a result of DSLLC's breach of the Note and failure to pay amounts due on the Maturity Date, the Loan is further accruing Default Interest.

63.     Pursuant to the terms of the Note, DSLLC is likewise liable for all of ZB's costs and attorney's fees incurred in collection.

64.     Likewise, each of the Guarantors have, as of the Maturity Date, breached the Guaranties by their failure to pay ZB the entire amount due as of the Maturity Date.

65.     Pursuant to the Guaranties, Each of the Guarantors are jointly and severally liable to ZB for all amounts due to ZB pursuant to the Note as of the Maturity Date, including all unpaid interest, Default Interest, principal, costs, and attorney's fees.

66.     ZB commenced this action as a result thereof on or about April 28, 2024.

**ZB Discovers Numerous Frauds Committed by the Kessler Defendants**

67.     Since the filing of the instant action ZB has discovered numerous material misrepresentations and/or omissions of fact by the Kessler Defendants.

68.     First, upon information and belief, ZB has obtained evidence which implies that the monies provided pursuant to the Loan were not used to pay for "affiliate marketing" as was represented to ZB to induce ZB into making the Loan, but rather were used for other purposes of Kaplan, Kessler, Supply and/or SLIM.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

69.     Specifically, text messages reveal that on the morning of April 28, 2023, the day that ZB funded the Loan, as ZB was insisting on getting fully executed documents, Kaplan was pressuring Ahmad to send his executed guaranty and had the following exchange:

- 9:00 AM- I have to get documents from you in the next 30 minutes. (Kaplan)

- 9:42 AM- Call you shortly. My NJ universities partners are here this morning (Ahamad).

- 9:43 AM- Sorry bro, this is more important. I signed for 15m personally and the Medicare run ends Sunday. I have 7.5m more coming this am that I told the investors had to be today. NEED THAT DOCUMENT (Kaplan), (emphasis added).

- 9:52 AM – Should I come get it? (Kaplan)

- 11:27 AM - Bro, you're putting me in horrible spot (Kaplan)

- 11:49 AM – Sent (Ahmad).

70.     From the exchange, it is believed that Kaplan needed Ahmad's guaranty to obtain ZB's money for purposes other than as represented to ZB.

71.     Moreover, from a review of the limited banking records Supply has provided in this case, it appears the entirety of the money loaned by ZB, as well as other parties around the same time, was gone and wired out to unknown accounts within a matter of days, which was contrary to what Kessler and Kaplan told ZB about how its money was going to be deployed.

72.     Further, the claims that all of this money was spent on "affiliate marketing" are suspect.

73.     Kessler/DSLLC have claimed, at various times and to various parties, to have raised more than $20 million from investors, including ZB.

74.     Between April and mid-July of 2023, DSLLC/Supply were paid more than $21 million by The Laboratory - - more than enough to return ZB's money.

75.     By then, the Medicare program, which only ran for total of 73 days, was well over

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

with and the numbers just do not add up.

76.     A review of records produced seems to indicate that the Kessler and Kaplan took in approximately $6 million more than they claim to have spent on the Medicare/Medicaid program, but there is no indication of where that money went.

77.     The invoices provided by DSLLC to allegedly substantiate their marketing expenses are suspect.

78.     These invoices provide little if any information about what services were supposedly provided.

79.     ZB has learned that The Laboratory is likewise suspicious of DSLLC's "expenses" and has refused to pay them absent supporting documentation.

80.     The Laboratory is asserting claims against DSLLC for material breaches of the MSA.

81.     Moreover, despite the Kessler and Kaplan claiming that DSLLC is owed a minimum of $20 million, to as much as $30 million from The Laboratory, ZB has learned that The Laboratory contends that DSLLC has been paid all monies it is due from the Medicare program—including monies to repay ZB—and that DSLLC will receive no further payments when and if the government releases any additional monies to The Laboratory.

82.     Indeed, in discovery, ZB learned that DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC.

83.     Apparently, per their own testimony, DSLLC and Orchard never actually agreed on terms for DSLLC's compensation.

84.     Thus, contrary to Kaplan and Kessler's representations about how successful and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

pay ZB its promised interest) at all.

85.     Stunningly, also, ZB has obtained evidence that nearly all of the representations in described in Paragraph 47 concerning the financial performance of DSLLC's business were false and/or omitted material facts.

86.     First, on or about June 23, 2023, just about 45 days after ZB made the Loan, the CoventBridge Group, on behalf of the Centers for Medicare & Medicaid Services ("CMS"), issued a Notice of Suspension of Part B Medicare Payments to The Laboratory, whereby CMS suspended all payments for reimbursement of COVID-19 test kits pursuant to 42 C.F.R. 405.371(a)(2) as the result of "credible allegations of fraud." (the "Suspension Notice").

87.     The Suspension Notice further states that 429 Complaints were filed by beneficiaries of the Medicare program, alleging that various types of fraudulent activity occurred, including identity theft.

88.     ZB understands that as result of the management services agreement between DSLLC and The Laboratory, all of the activity under review by CMS was performed and managed by the Kessler Defendants.

89.      But importantly, from June of 2023 until March/April of 2024, Kaplan/Kessler did not disclose one word of this to ZB.

90.     DSLLC had a duty to do so, as the Note required the disclosure of financial information and ZB certainly asked for that information, as detailed above.

91.     But instead and as shown in Paragraph 47 above, Kaplan/Kessler knew that CMS had suspended payments, but continued to lie to ZB and tell ZB the business was doing great.

92.     Those lies included specific false representations concerning the performance of the Medicaid program.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

15

93.     Additionally, and unbeknownst to ZB, Kessler and Kaplan paid back DSLLC's other investors in July and August, 2023.

94.     And by August, 2023, they sent over $6 million to Supply and SLIM from DSLLC, leaving DSLLC a hollow shell.

95.     Finally, Kaplan's and Kessler's statements concerning payments received and expected to be received from the Medicaid program, were totally false and known to be so when made.

96.     Neither DSLLC nor The Laboratory were ever paid a single dollar from the Medicaid program, despite telling ZB, in writing, the contrary multiple times.

**COUNT I**
**BREACH OF CONTRACT**
**(Against DSLLC and Supply)**

97.     ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

98.      The Note is a binding and enforceable contract between ZB and DSLLC.

99.     ZB performed its obligations pursuant to the Note by disbursing $4,850,000 to Supply.

100.    DSLLC breached the Note by failing to pay ZB all amounts due on the Maturity Date, including interest and principal in the amount of at least $4,893,111.12 plus accrued Default Interest.

101.    DSLLC has further breached the Note by its failure to provide financial information requested by ZB on multiple occasions.

102.    ZB has been damaged by DSLLC's breaches in amount to be determined at trial, but believed to be in excess of $25,000.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

103.    DSLLC is the mere instrumentality of Supply used to commit a wrong through its breach of contract with ZB.

104.    DSLLC was undercapitalized such that Supply covered DSLLC's business expenses and finances were not separated between the companies.

105.    In fact, Supply and DSLLC comingled funds, business resources, and employees.

106.    Before DSLLC was formed, Supply was the one performing marketing services on behalf of the COVID-19 program.

107.    Further, DSLLC did not have a bank account at the time the Loan was made and thus the monies were deposited in Supply's bank account.

108.    ZB has further learned that numerous purported expenses from DSLLC's business were billed to and/or paid by Supply.

109.    Records show that Supply ordered and paid for marketing on behalf of DSLLC, received monies on behalf of DSLLC, and received monies from DSLLC.

110.    By August, 2023, once DSLLC had its own bank account, over $5 million was sent to Supply from DSLLC, leaving DSLLC a hollow shell.

111.    Supply and DSLLC thus commingled funds, business, employees and other resources such that DSLLC was merely an alter-ego of Supply and it is appropriate to pierce the corporate veil through DSLLC to Supply.

WHEREFORE, ZB requests judgment in its favor and against DSLLC and Supply in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

17

## COUNT II
## BREACH OF CONTRACT
### (Against Kessler and Ahmad)

112.   ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

113.   The Guarantees are binding and enforceable contracts between ZB and the Guarantors.

114.   ZB performed its obligations pursuant to the Guarantees by disbursing $4,850,000 to Supply.

115.   The Guarantors breached the Guarantees by failing to pay ZB all amounts due on the Maturity Date, including interest and principal in the amount of at least $4,893,111.12 plus accrued Default Interest.

116.   ZB has been damaged by the Guarantor's breaches in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler and Ahmad, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
### (Against Kessler and Ahmad)

117.   ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

118.   The Guarantees are binding and enforceable contracts between ZB and Guarantors.

119.   The Guarantees contain an express representation and warranty that "…(e) that at

the time of execution and delivery of this Guaranty, and as long as the Guaranty is in effect, each Guarantor has minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is in assets solely in the name of each Guarantor."

120. Upon information and belief, the Guarantors breached their express representations and warranties, as it believed, and based upon their own representations, that they did not and do not have a minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is not held in assets solely in the name of each Guarantor.

121. ZB has been damaged by the Guarantor's breaches in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler and Ahmad, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT
### (Against Supply)

122. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

123. ZB conferred a benefit upon Supply by disbursing $4,850,000 directly to Supply.

124. It is inequitable for Supply to retain the monies disbursed by ZB when DSLLC and the Guarantors have failed to repay the Loan.

125. Supply has thus been unjustly enriched at ZB's expense in an amount to be determined at trial, but believed to be in excess of $25,000.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

WHEREFORE, ZB requests judgment in its favor and against Supply in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT V
## FRAUD
### (Against Kessler, DSLLC, Supply, and SLIM)

126.     ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

127.     Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, induced ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

128.     Specifically, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kessler represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business

- There was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023, and after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Their business was spending in excess of $750,000 per day on affiliate marketing.

- "[T]he purpose of the funds was to allow us to maximize traffic for Medicare, which we are running until the end of the month. The purpose of the funds was to bridge the gap of 21 days for when we start receiving payments from CMS for those initial large batches. We should be getting out first big check from CMS next week, around $10M+. So we need funds this week to maximize the affiliate marketing through the end of April."

- "Yeah, the rush is to get the funds in this week to maximize Medicare subscriptions. Any Medicare patients we get this week (through the end of April) we can bill in April, and then again in May. Come May 1, we are transitioning focus to Medicaid, which goes until September 2024. So there's not a big rush."

- "No worries. Medicaid will be largely self funded because we will have already received all the large payments back from CMS for Medicare billings. […] By the time Medicaid comes, the machine will largely run itself."

129. Similarly, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kaplan, on behalf of Kessler and DSLLC, represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business

- There was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023, and after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

- Their business was spending in excess of $750,000 per day on affiliate

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

marketing.

- Kaplan represented that he had conversation with ZB's principals that "we would look to provide testing to Medicaid recipients with – you know, through Orchard through the Verified Health platform."

- Further, Kaplan represented that "We expected Divided Sky's business to continue, with Medicaid at that time being the focus."

- Kaplan represented to ZB that "[…] Medicare was so successful that the direction was that we would move to Medicaid after that date just from a logic perspective, the iron was hot, so to speak, with Medicare and it had meaningful traction, so Medicaid would be focused on as Medicare was wound down, so to speak."

130. Upon information and belief, these representations were false and known to be false at the time they were made because, upon information and belief, DSLLC used the money ZB loaned to DSLLC for other purposes of Kaplan, Kessler, Supply and/or SLIM, DSLLC never had a contract with The Laboratory, and the Kessler Defendants never sold a single test to Medicaid subscribers.

131. Further, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation.

132. Thus, contrary to Kaplan and Kessler's representations about how successful and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to pay ZB its promised interest) at all.

133. Kessler and Kaplan's misrepresentations were made, individually and as agents for DSLLC, Supply, and SLIM, with the intent that ZB rely and ZB did rely upon the false representations in making the Loan.

134. Supply and SLIM acted in concert with Kessler and Kaplan to further a common purpose and are therefore also liable for the false representations.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

135.     Specifically, the Offering identifies SLIM as a participant in DSLLC's business. Thus, SLIM was a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections and benefitted from the false representations made by its principal and on its behalf.

136.     Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

137.     ZB's reliance was reasonable because, among other things, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, provided ZB with information purportedly establishing the bonafides of their business and even touted the success and returns that other supposed investors had reaped.

138.     ZB was damaged by Kessler's and Kaplan's false representations in an amount to be determined at trial, but believed to be in excess of $25,000.

139.     Kessler and Kaplan's actions, individually and as agents for DSLLC, Supply, and SLIM, were intentionally willful and wanton such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT VI**
**FRAUD**
**(Against Kessler, DSLLC, Supply, and SLIM)**

140.     ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

141.    The Note contained obligations upon DSLLC to provide truthful and accurate financial information to ZB upon request.

142.    ZB made numerous requests to the Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, to provide information concerning the status of DSLLC's business and financial performance from April of 2023 through April of 2024.

143.    Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, made numerous outright misrepresentations of fact to ZB and intentionally omitted material facts concerning the financial performance of DSLLC's business, including but not limited to the following:

- On May 5, 2023, ZB asked Kessler how the numbers have been and if ZB could receive weekly/monthly/quarterly updates. Kessler responded, "Quarterly updates work. Haven't put big heat on Medicaid yet, trying to wrap up Medicare. We've lowered marketing spend but are still getting 5k per day of Medicare. Total April was 300k. Got $5M yesterday as first big payment from Medicare." These representations are believed to be false. The Kessler Defendants never received a single dollar from Medicaid. The Kessler Defendants did not receive $5 million on May 4, 2023.

- On May 30, 2023, ZB asked Kessler for another update and "When do you think you will start executing on the Medicaid program." In response Kessler wrote, "We started soft launch of Medicare[sic] – very small – to test some new features out. We've collected about $20m and expect another $22m in this week. *Medicaid." This was false. There was no payments from Medicaid.

- May 30, 2023 when asked why DSLLC had not deployed capital for Medicaid for yet, Kessler responded "Well we haven't deployed the capital form the receivables for Medicaid yet because we are in the process of testing out new features on the website, testing marketing channels, and confirming various insurance procedures for the respective states." This was false.

- On June 26, 2023 ZB requested an update call. On June 27, 2023, the parties had a zoom call wherein Kessler assured ZB, in substance, that the business was performing incredibly well. This was false.

- On July 5, 2023, Kaplan, on behalf of the Kessler Defendants, sent ZB a memo representing the following:

    o "From March of 2023 until the FHE was lifted, approximately

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

350,000 Medicare recipients signed up to receive Tests of which roughly 300,00 received at least 2 shipments. During the program, The Laboratory dispensed more than 5,000,000 Tests. CMS has requested some additional information from The Laboratory for roughly 70 patients (out of 400,000 since the Program's inception) which we have provided…During the Program, Verified Health exceeded its revenue projections." This was false and/or omitted material facts. The Kessler Defendants had already received the Suspension Notice.

- o "…Due to the increased risk resulting from multiple payers, The Laboratory has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state, to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks. We are excited with the results to date." This was false. There were no payments received from Medicaid.

- Attached to that same memo, Kaplan sent a "Project Income Statement" which claimed more than $61 million in revenue and $21 million in net income. Upon information and belief, these numbers are not accurate.

- The Kessler Defendants failed to disclose to ZB for almost an entire year that CMS had issued the Suspension Notice and that all payments and/or participation in any reimbursement program had been suspended.

- In early 2024, as ZB grew concerned about the status of its investment, the Kessler Defendants participated in a phone call with ZB to provide "updates" on the program's status. During this call, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, made further false and fraudulent statements to ZB:

  - Kaplan: "But there has been absolutely nothing conveyed to us that there is an issue paying us. There's been nothing conveyed to us that we're not getting paid or even the smell of that. Nothing. Nothing close to it." However, Kessler and Kaplan had received the Notice of Suspension from CMS.

  - Kaplan: "So let's go back. We believe that all of the money should have been given to us, rather any of it being retained by the lab. Right. To be clear, that is at dispute with the lab, the topic that they retained a piece of the money in the process, but there is not a dispute as to their obligation to pay the money." Orchard has not acknowledged any obligation to pay DSLLC and in fact contests that it owes DSLLC any additional money.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Kaplan: "So more than half of the revenue was paid in our hands, and the rest was approved to be paid but held back in escrow. And then they had a inquiry related to 300 patients out of the 500,000. The inquiry we passed at, like a 96% rate, whatever it is. And the rest of the money is set to be paid out. They have to pay it. I think it's by. I don't know the exact date. I think it's a second week of March, the third week of March. But they have given us a date of when that should be handled by. And the inquiry was not expanded. It was limited to, you know, that 1% of our patient, you know, one and a half percent of our patient base." The investigation related to 429 complaints, not 300. Further, the government did not 'have to pay it,' and it still has not been paid.

- Kaplan: "Sure. Yeah. And that's why, again, we don't view this as like we're drowning in a pool. We'd like to know that we had all the cash on hand, but it's not something that is I'm not losing sleep over it, put it that way. Besides that, the money that's owed by CMS, if CMS, God forbid, came back and took a 50% discount on the cash, which would never happen, but let's just say they did, there's still more than enough money left to pay everybody." Financial records demonstrate that the company had no available funds in early 2024 to repay its lenders.

- Further, and despite representations that the business was performing incredibly well and that there would be money to pay ZB back, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation. Thus, DSLLC did not have an ability to profit (nor an ability to pay ZB its promised interest) at all.

- Additionally, Kessler and Kaplan paid back DSLLC's other investors in July and August, 2023. Further, by August 2023, they sent over $6 million to Supply Line and SLIM from DSLLC, leaving DSLLC a hollow shell. Though this impacted DSLLC's ability to pay ZB and this was never disclosed to ZB.

144.    All of the above representations were false, known to be false when made and/or known that material facts were omitted which were required to be disclosed to ZB.

145.    Such misrepresentations and/or omissions were made with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

146.     Supply and SLIM acted in concert with Kessler and Kaplan to further this common purpose and are therefore also liable for the false representations.

147.     Specifically, SLIM, a participant in DSLLC's business who was responsible for obtaining the COVID-19 test kits from its supply chain connections, benefitted from the false representations because it was able to keep the scheme running for longer.

148.     Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations because it did not need to account for the money upon ZB's exercising of the Acceleration Option.

149.     ZB's reliance was reasonable because, among other reasons, DSLLC continued to make interest payments throughout 2023 and into February of 2024, leading ZB to believe that it would be paid upon the maturity of the Note.

150.     ZB was damaged by Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM,  and their false representations and/or material omissions in an amount to be determined at trial, but believed to be in excess of $25,000

151.     Kessler and Kaplan's  misrepresentations, individually and as agents for DSLLC, Supply, and SLIM,   were intentional, willful and wanton, such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.


F"

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**COUNT VII**
**FRAUD**
**(Against Kessler, DSLLC, Supply, and SLIM)**

152.     ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

153.     Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, induced ZB to loan them money to be used for what was described to ZB's principals as a legitimate, legal business.

154.     Specifically, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kessler represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- "[T]he purpose of the funds was to allow us to maximize traffic for Medicare, which we are running until the end of the month. The purpose of the funds was to bridge the gap of 21 days for when we start receiving payments from CMS for those initial large batches. We should be getting out first big check from CMS next week, around $10M+. So we need funds this week to maximize the affiliate marketing through the end of April."

- "Yeah, the rush is to get the funds in this week to maximize Medicare subscriptions. Any Medicare patients we get this week (through the end of April) we can bill in April, and then again in May. Come May 1, we are transitioning focus to Medicaid, which goes until September 2024. So there's not a big rush."

- "No worries. Medicaid will be largely self funded because we will have already received all the large payments back from CMS for Medicare billings. […] By the time Medicaid comes, the machine will largely run itself."

155.     Similarly, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kaplan, on behalf of Kessler and

page number

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DSLLC, represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- Kaplan represented that he had conversation with ZB's principals that "we would look to provide testing to Medicaid recipients with – you know, through Orchard through the Verified Health platform."

- Further, Kaplan represented that "We expected Divided Sky's business to continue, with Medicaid at that time being the focus."

- Kaplan represented to ZB that "[…] Medicare was so successful that the direction was that we would move to Medicaid after that date just from a logic perspective, the iron was hot, so to speak, with Medicare and it had meaningful traction, so Medicaid would be focused on as Medicare was wound down, so to speak."

156.    Upon information and belief, those representations were false and known to be false, as the Suspension Notice cites "credible allegations of fraud" by the Kessler Defendants in their selling of COVID-19 test kits.

157.    Further, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation.

158.    Thus, contrary to Kaplan and Kessler's representations about how legitimate and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to pay ZB its promised interest) at all.

159.    Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, intended that ZB would rely upon and ZB did rely upon such misrepresentations in agreeing to loan them money.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

160.     Supply and SLIM acted in concert with Kessler and Kaplan to further this common purpose and are therefore also liable for the false representations.

161.     SLIM, a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections, benefitted from the false representations made by its principal and on its behalf.

162.     Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

163.     ZB's reliance was reasonable because it had no reason to believe that the Kessler Defendants were engaged in fraudulent and/or criminal activity.

164.     ZB was damaged by Kessler and Kaplan's, individually and as agents for DSLLC, Supply, and SLIM, false representations and/or material omissions in an amount to be determined at trial, but believed to be in excess of $25,000

165.     The Kessler Defendants' misrepresentations were intentional, willful and wanton, such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT VIII**
**(CONVERSION/STATUTORY STEALING MCL 600.2919a)**
**(Against Kessler, DSLLC, Supply, and SLIM)**

166.     ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

167. The Kessler Defendants induced ZB to loan DSLLC money under false pretenses, by the communication of knowingly false representations that the money would be used to pay the expenses of affiliate marketing utilized to capture Medicare and Medicaid patients to register with VH to receive COVID-19 test kits that would be paid for and/or reimbursed by the Federal Government, that they had a successful Medicaid business, and they had an agreement with Orchard to be paid when they did not.

168. Upon and information and belief, for the reasons stated in Paragraph 68 through 81 above, the monies loaned by ZB were not used for that purpose and were instead used for other purposes.

169. The Kessler Defendants stole ZB's money by false pretenses in violation of MCL 600.2919a.

170. ZB has been damaged as a result in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, trebled pursuant to MCL 600.2919a, plus pre-and post- judgment statutory interests, costs, attorney's fees pursuant to MCL 600.2919a and such other and further relief the Court deems just and proper.

### COUNT IX
### CIVIL CONSPIRACY
### (Against Kessler, DSLLC, Supply, and SLIM)

171. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

172. Defendants illegally, maliciously, and wrongfully conspired with one another with

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the intent to, and for the illegal purpose of engaging in the impermissible acts described previously in Paragraphs 67 through 96 above.

173.    Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, conspired to induce ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

174.    Moreover, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, conspired to make post-contractual misrepresentations and/or omissions with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

175.    Kessler and Kaplan's actions, individually and as agents for DSLLC, Supply, and SLIM actions, in combination, were designed  to accomplish a criminal or unlawful purpose or a lawful purpose by criminal or unlawful means.

176.    ZB has been damaged as a result in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT X**
**CONCERT OF ACTION**
**(Against Kessler, DSLLC, Supply, and SLIM)**

177.    ZB repeats and realleges each of the foregoing allegations as though fully restated

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

herein.

178.    Defendants Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly and tortiously pursuant to a common design to engage in the impermissible acts described previously in Paragraphs 67 through 96 above.

179.    Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly to induce ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

180.    Moreover, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly to make post-contractual misrepresentations and/or omissions with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

181.    Further, Supply and SLIM acted in concert with Kessler and Kaplan to further a common purpose and are therefore also liable for the false representations.

182.    Specifically, the Offering identifies SLIM as a participant in DSLLC's business. Thus, SLIM was a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections and benefitted from the false representations made by its principal and on its behalf.

183.    Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

184.    ZB has been damaged as a result in an amount to be determined at trial, but believed

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

*/s/ Ethan R. Holtz*
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

Dated: October 8, 2025

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF:

JOSHUA ADAM KAPLAN

                              Debtor.

_____/

Chapter 7
Case No. 25−48523−tjt
Hon. Thomas J. Tucker

## **MOTION TO ENFORCE AUTOMATIC STAY**

Josh Kaplan ("Debtor"), by and through his attorneys, OSIPOV BIGELMAN, P.C., states as follows:

### **Jurisdiction and Venue**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(G).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The relief sought herein is based on 11 U.S.C. §§ 105(a) 362, and 541.

### **Background and Facts**

5. The Debtor filed a Chapter 7 Bankruptcy petition on August 22, 2025.

6. Prior to the filing of Kaplan's bankruptcy petition, on June 16, 2025, the Oakland County Circuit Court in <u>Comerica Bank v. Supply Line International, LLC et. al</u>[1]., Case No. 25-215602-CB ("Lawsuit") appointed Basil Simon ("Receiver") as receiver over <u>assets owned by SLI</u> ("Receiver Order").  **Exhibit 6-A.**

7. The Receiver Order at ¶5 states that it "does not transfer ownership of the receivership assets nor ownership of SLI" to the Receiver.

---

[1] As a result of the bankruptcy filing, the bankruptcy estate has an 82% interest in Supply Line International, LLC ("SLI").

8. The Receiver Order at ¶9 states that the Receiver is to take possession of electronically stored data…<u>belonging to SLI</u> that relate to the receivership assets.

9. On or about June 30, 2025, Receiver was provided with credentials which authorized him to access data files on the Server owned by SLI, only.

10. Pertinent to this bankruptcy case is the fact that the Server contains electronically stored data owned by the Debtor, including attorney-client privileged emails between Debtor and his attorney(s); information needed by the Debtor to complete his 2024 income tax returns; and information of affiliated entities whose direct and potentially indirect interests are property of the bankruptcy estate. These include, but are not limited to:

      (1)    Supply Line International, LLC[2]

      (2)    Supply Line International Medical, LLC

      (3)    Supply Line International Real Estate Holdings, LLC

      (4)    Karim BLVD Real Estate Holdings, LLC

      (5)    Karim ASC, LLC

      (6)    Divided Sky, LLC

      (7)    Medical Venture Solutions, LLC

      (8)    Divided Sky Holdings, LLC; and

      (9)    Verified Laboratories, LLC

11. The seizure of the Server and the exercise of control over the Debtor's property (electronically stored data) is problematic for the Debtor as it pertains to this bankruptcy case because:

      A.    The electronically stored data on the Server as it pertains to the Debtor is property of the bankruptcy estate.

---

[2] Comerica's security interest may cover SLI's electronic data, but it does not have a security interest over the Debtor or any of his affiliated entities.

B. The electronically stored data on the Server includes the Debtor's emails, including attorney-client privileged communications between Debtor and his attorneys regarding pending litigation and expected future litigation.

C. The Trustee has made demands upon Debtor for documentation and has asked that he file his 2024 income tax returns, which is not possible without the Debtor's personal electronically stored data and the electronically stored data related to affiliated companies who need to file income tax returns contemporaneously with the Debtor.

D. Creditors have made demands upon Debtor for documentation pertaining to his financial affairs and those of his affiliated companies which included within the electronically stored data is located at least in part on the Server.

E. One of his creditors has filed a motion for a 2004 Examination seeking information pertaining to his financial affairs and those of his affiliated companies. ECF No. 46.

F. There exists pending litigation with at least four of his affiliated companies whose interest is property of the bankruptcy estate.

12. As such, the Debtor needs access to the information described above for the proper administration of his bankruptcy case.

13. The Receiver accepted an offer to sell the Server to an affiliate of SLI's manager which included an access agreement that would have preserved access to the electronically stored data on the Server for all parties in interest, but that sale was vetoed by Comerica.

14. After that sale was vetoed, the Receiver seized the Server, by unplugging it, dismantling it, and moving the dismantled components to a different location. The result of this action deprived the Debtor access to his electronically stored data, including his emails.

15. Prior to this action, there were no access issues for any interested party.

16. Instead, the Receiver has taken action in state court against the manager of SLI in order to obtain unfettered access to the Server, in an effort to exercise complete control of property of the estate in violation of Section 362 of the Code.

17. The State Court has no right to adjudicate matters pertaining to the property of the estate as the bankruptcy court has exclusive jurisdiction over property of the bankruptcy estate.

18. Comerica, who hired the Receiver, has taken the position that because it has a security interest in the property of SLI, which owns the physical layer of the Server (but not the data owned by other authorized users including Debtor), it – through the Receiver – has the right to exercise dominion and control over the electronically stored data on the Server, , and that the Debtor "should have no expectation of privacy" in regard to his data. **Exhibit 6-B**.

19. Comerica's claims are factually incorrect and legally invalid, and are inconsistent with the Receiver Order, which grants the Receiver authority only over the "electronically stored data … belonging to [SLI].

20. The Receiver has taken a more reasoned approach, acknowledging that it does not own all of the data on the Server, however, it has not made a reasonable proposal that provides the Debtor with his electronically stored data, and addresses his privacy and privilege concerns. **Exhibit 6-C**.

21. The Debtor has submitted a proposal to the Receiver that meets everyone's needs and addresses everyone's concerns. **Exhibit 6-C**. However, this proposal was ignored.

## Applicable Law

Section 541(a) of the Bankruptcy Code defines what is property of a debtor's bankruptcy estate. It provides, in relevant part:

> The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, <u>all legal or equitable interests of the debtor in property</u> as of the commencement of the case.

Pursuant to 28 U.S.C. § 1334, the bankruptcy court has "exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of the property of the estate." 28 U.S.C.A. § 1334.  Murray v. Murray (In re Murray), 31 Bankr. 499, 501 (Bankr. E.D. Pa. 1983). This grant of jurisdiction indicates a conscious effort by Congress to provide the bankruptcy court special jurisdiction, and to preclude jurisdictional disputes between state and federal courts when both courts base jurisdiction on control of the same property.  White v. White (In re White), 851 F.2d 170, 172-73 (6th Cir. 1988).

The filing of a bankruptcy petition also operates as an automatic stay of judicial proceedings and acts to "exercise control over the property of the estate." 11 U.S.C.A. § 362(a). Section 362 of the Bankruptcy Code states, in pertinent part:

(a)      Except as provided in subsection (b) of this section, a [Chapter 13 Petition] . . . operates as a stay, applicable to all entities, of—

(3) any act to obtain possession of property of the estate or to exercise control over property of the estate;

(k) (1)  Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

### Discussion

There is not any reasonable dispute that the Debtor owns certain data on the Server, including, but not limited to:

A.      His personal financial information

B.      His emails including, but not limited to; attorney-client privileged emails

C.      The documents necessary for the Debtor to file his 2024 income tax returns;

D.      The documents in regard to the bankruptcy estate's interest in companies formally owned by the Debtor;

E.    The documents that the Debtor may be required to produce if the Court grants a 2004 motion seeking information pertaining to his financial affairs and those of his affiliated companies.  ECF No. 46.

("Debtor's Data").

As this information was property of the Debtor and is now property of the bankruptcy estate, the bankruptcy court has exclusive jurisdiction over the property.  As the Receiver, at the behest of Comerica has seized the Server, refused to provide reasonable access to the Debtor's data, and has exercised control over property of the estate, he has violated the automatic stay.

The Debtor is **not** yet seeking monetary sanctions against the Receiver or any other party, the Debtor only requests that this Court grant the following relief:

1.    Find that the Debtor's Data is property of the Debtor/bankruptcy estate;

2.    Find that the Bankruptcy Court has exclusive jurisdiction over the Debtor's Data;

3.    Find that any further action depriving the Debtor with access to the Debtor's Data or exercising control over the Debtor's Data would be a violation of the automatic stay; and

4.    Order the Receiver to image all of the SLI electronically stored data for its own use and turn over the Server to the Debtor or a neutral third party to ensure access for the Debtor and other interested parties.

Concurrence was requested for the relief sought herein was requested and not received.

WHEREFORE, the Debtor requests that the Court grant the relief more fully set forth in the proposed order attached hereto as **Exhibit 1.**

Respectfully submitted,

**OSIPOV BIGELMAN, P.C.**

DATED: November 12, 2025

*/s/ Jeffrey H. Bigelman*
JEFFREY H. BIGELMAN (P61755)
Attorneys for Debtor
20700 Civic Center Drive, Suite 420
Southfield, MI 48076
Tel: 248-663-1800/Fax: 248-663-1801
jhb@osbig.com

# Exhibit C

Joshua Adam Kaplan            Chapter 7
Case No. 25-48523-tjt

       Debtor.

                            Hon. Thomas J. Tucker

_____/

*PROPOSED*
**ORDER DIRECTING PRODUCTION
OF DOCUMENTS AND ORAL EXAMINATION
<u>DEBTOR, JOSHUA ADAM KAPLAN</u>**

THIS MATTER is before the Court on *Motion for Order Directing Production of Documents and Oral Examination of Debtor, Joshua Adam Kaplan* (the "<u>Motion</u>") filed by ZB Verified Investments, LLC ("<u>ZB</u>"); notice of the Motion having been properly served; and no responses or objections were timely filed or served,

NOW THEREFORE, IT IS HEREBY ORDERED, the Motion is GRANTED, Debtor, Joshua Adam Kaplan ("<u>Debtor</u>"), is hereby directed to produce the following records to ZB within seven days of the entry of this Order:

1.      Debtor's personal and Divided Sky LLC's company income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return for each of the tax years, 2023 and 2024.

2. Debtor's paystubs and W-2s for each of the years 2021, 2022, 2023.

3. Any prepared personal financial statements that Debtor has prepared for any purpose during any period from 2021 to current.

4. Any prepared financial statements of Divided Sky LLC that have been prepared for any purpose during any period from 2023 to current.

5. All loan documents, mortgage documents, promissory notes, guarantees, contracts and land contracts including current statement balances for all of Divided Sky, LLC's and/or Debtor's debt obligations in existence on or within the prior two years of his bankruptcy filing date.

6. All loan documents, mortgage documents, promissory notes, guarantees, contracts and land contracts including any evidence of any indebtedness owed to Divided Sky, LLC's and/or Debtor that was in existence on or within the prior two years of the Debtor's petition date of August 22, 2025 (the "Petition Date").

7. All of Divided Sky LLC's credit union, loan association or similar institution statements and cancelled checks for accounts titled solely in its name or on which Divided Sky LLC is an account holder for 2023 through present date (even if such accounts were closed on a date earlier than the Petition Date), with the exception of statements from JPMorgan Chase Bank ending in 0008.

8. All of Debtor's bank, credit union, loan association or similar

institution statements and cancelled checks for accounts titled solely in his name or on which Debtor is an account holder for 2020-current (even if such accounts were closed on a date earlier than the Petition Date), with the exception of statements for the Chase Bank account ending in 9188.

9.     Payment records such as cancelled checks or other record of payment for the two years prior to Debtor's bankruptcy filing date for debt payments made by or on behalf of Divided Sky, LLC and/or Debtor on Divided Sky, LLC's and/or Debtor's debt obligations.

10.    All complaints and answers thereto filed in any lawsuits or administrative proceedings to which Divided Sky, LLC and/or Debtor has been a party from 2023 to current date.

11.    Copies of all deeds, land contracts, title polices, closing documents, closing statements, liens, encumbrances and appraisals or similar real estate records for all real estate Divided Sky, LLC and/or Debtor own in the United States or internationally.

12.    Operating agreements, bylaws, buy-sell agreements and shareholder agreements for any companies, corporations, partnerships, joint ventures or other business entities that Divided Sky, LLC and/or Debtor have or had any direct or indirect ownership in during the two years prior to Debtor's bankruptcy filing date and through the current date.

3

13.    All of Divided Sky, LLC's and/or Debtor's monthly credit card statements for the periods of 2023 through current for all credit card accounts held by Divided Sky, LLC's and/or Debtor alone or jointly with any other entities or persons with the exception of credit card statements for an American Express card with account ending in 9-71005, 7-2002, 4-92002, 3-85004 and Chase Card ending in 9188 for the period of April, 2023 to March, 2025 which have already been produced by Debtor.

14.    All employment agreements including agreements or communications regarding Debtor's employment compensation for any entity or person that employed Debtor for 2020 through the Petition Date.

15.    All documents evidencing ownership of any internet domains or URLs that Debtor's or any entity that Debor either directly or indirectly controls or owns in whole or in part, including Divided Sky, LLC.

16.    All documents regarding or reflecting any intellectual property owned in whole or in part, directly or indirectly, by Debtor and/or Divided Sky, LLC.

17.    All documents regarding or reflecting any gifts or gratuities Debtor has received from relatives, friends, or others in the two years prior to the bankruptcy filing date.

18.    All documents regarding or reflecting any inheritance or gifts that generate interest or that should have generated interest for Debtor's benefit during

4

the three years prior to the bankruptcy filing date.

19.     All documents evidencing payments or transfers by Divided Sky, LLC to Debtor.

20.     All documents evidencing payments or transfers by Orchard Laboratories Corp. to Debtor.

21.     All documents evidencing payments or transfers by Supply Line International, LLC to Debtor.

NOW THEREFORE, IT IS FURHTER ORDERED, that ZB is authorized file and serve upon Debtor a notice of his deposition at least seven days in advance of the Rule 2004 examination date.

# Exhibit D

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

ZB VERIFIED INVESTMENTS LLC,

      Plaintiff,

Case No. 24-207081-CB

v.

Hon. Michael Warren

ADAM KESSLER; JOSHUA KAPLAN;
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

      Defendants.

| | |
|---|---|
| Ethan R. Holtz (P71884) | Thomas W. Cranmer (P25252) |
| Emily M. Mayer (P78956) | Caroline Giordano (P76658) |
| Taft Stettinius & Hollister LLP | Kimberly L. Scott (P69706) |
| 27777 Franklin Road, Suite 2500 | Miller, Canfield, Paddock and Stone, PLC |
| Southfield, MI 48034 | 840 West Long Lake Road, Suite 150 |
| (248) 351-3000 | Troy, MI 48098 |
| eholtz@taftlaw.com | (248) 879-2000 |
| emayer@taftlaw.com | cranmer@millercanfield.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendants Kessler, Kaplan,* |
| | *Divided Sky, LLC, and Supply Line* |
| | *International, LLC* |
| | |
| Sean T.H. Dutton (P77515) | Jeffrey H. Bigelman (P61755) |
| Callan G. Stein (Admitted PHV) | Osipov Bigelman, P.C. |
| Michael Lowe (Admitted PHV) | *AS BANKRUPTCY ATTORNEY ONLY* |
| Troutman Pepper Hamilton Sanders LLP | 20700 Civic Center Drive, Ste. 420 |
| 4000 Town Center, Suite 1800 | Southfield, MI  48076 |
| Southfield, MI 48075 | Tel: (248) 663-1800 |
| (248) 359-7300 | jhb@osbig.com |
| sean.dutton@troutman.com | |
| callan.stein@troutman.com | |
| Michael.lowe@troutman.com | |
| *Attorneys for Defendant Sami Ahmad* | |

## NOTICE OF AUTOMATIC STAY

PLEASE TAKE NOTICE that Joshua Kaplan, filed a Chapter 7 petition in bankruptcy on August 22, 2025 in the United States Bankruptcy Court, Eastern District of Michigan, Case Number 25−48523−tjt. By virtue of this filing, all property in which the Debtor has a legal or equitable interest as of the date of filing became property of the bankruptcy estate. In addition, Section 362(a) of the Bankruptcy Code provides that the filing of the petition automatically stays all creditors, governmental units or other entities from commencing or continuing, with certain exceptions, all proceedings against the Debtor with respect to pre-petition debts and all actions to obtain possession of the property of the estate, or to enforce any lien against any property of the estate, unless the automatic stay is terminated by the court order or otherwise. Section 362(a), (b), (c) and (d). There is no need for an attorney for a Debtor to obtain a court order to implement the automatic stay of Section 362(a).

PLEASE TAKE FURTHER NOTICE that OSIPOV BIGELMAN, P.C., is not filing an appearance in this case, only a notice of the filing of the Bankruptcy Petition.

Respectfully submitted,

**OSIPOV BIGELMAN, P.C.**

Dated: August 25, 2025

/s/ Jeffrey H. Bigelman
JEFFREY H. BIGELMAN (P61755)
AS BANKRUPTCY ATTORNEY ONLY
20700 Civic Center Drive, Ste. 420
Southfield, MI 48076
Tel: (248) 663-1800
jhb@osbig.com

**PROOF OF SERVICE**

I hereby certify that on August 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the MIFILE E-File & E-Serve System which will send notification of such filing to the attorneys of record and/or parties in this case.

/s/ Monique Kallabat
Monique Kallabat

# EXHIBIT A

Information to identify the case:

| | | | |
|---|---|---|---|
| Debtor 1 | **Joshua Adam Kaplan** | Social Security number or ITIN: | xxx–xx–8876 |
| | First Name   Middle Name   Last Name | EIN: _ _ – _ _ _ _ _ _ _ | |
| Debtor 2 (Spouse, if filing) | First Name   Middle Name   Last Name | Social Security number or ITIN: _ _ _ _ | |
| | | EIN: _ _ – _ _ _ _ _ _ _ | |
| United States Bankruptcy Court: | Eastern District of Michigan | | |
| Case number: | **25–48523–tjt** | Date case filed for chapter: 7   8/22/25 | |

## Official Form 309A (For Individuals or Joint Debtors)
## Notice of Chapter 7 Bankruptcy Case –– No Proof of Claim Deadline   10/20

For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtors or the debtors' property. For example, while the stay is in effect, creditors cannot sue, garnish wages, assert a deficiency, repossess property, or otherwise try to collect from the debtors. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although debtors can ask the court to extend or impose a stay.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**To help creditors correctly identify debtors, debtors submit full Social Security or Individual Taxpayer Identification Numbers, which may appear on a version of this notice. However, the full numbers must not appear on any document filed with the court.**

**Do not file this notice with any proof of claim or other filing in the case. Do not include more than the last four digits of a Social Security or Individual Taxpayer Identification Number in any document, including attachments, that you file with the court.**

**The court will dismiss this case without a hearing if the debtor(s) do not timely file all the required documents and if no request for a hearing on dismissal is filed within 21 days after the petition is filed. The Clerk will give notice of the hearing on dismissal only to the party requesting the hearing, the debtor and the trustee.**

| | | About Debtor 1: | | About Debtor 2: |
|---|---|---|---|---|
| 1. | **Debtor's full name** | Joshua Adam Kaplan | | |
| 2. | **All other names used in the last 8 years** | | | |
| 3. | **Address** | 7412 Carlyle Crossing<br>West Bloomfield, MI 48322 | | |
| 4. | **Debtor's attorney** Name and address | Jeffrey H. Bigelman<br>Osipov Bigelman, P.C.<br>20700 Civic Center Drive., Ste. 420<br>Southfield, MI 48076 | | Contact phone: 248–663–1800 |
| 5. | **Bankruptcy trustee** Name and address | Homer W. McClarty<br>19785 West 12 Mile Road<br>#331<br>Southfield, MI 48076 | | Contact phone: (248) 352–7686 |

**For more information, see page 2 >**

| | | |
|---|---|---|
| **6.  Bankruptcy clerk's office**<br><br>Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or register online at https://pacer.uscourts.gov. | **Address of the Bankruptcy Clerk's Office:**<br>211 West Fort Street<br>Detroit, MI 48226<br><br>Contact phone: 313−234−0065 | **For the Court:**<br>Clerk of the Bankruptcy Court:<br>Todd M. Stickle<br><br>Hours open:<br>8:30am−4:00pm Monday−Friday<br><br>Date: 8/22/25 |
| **7.  Meeting of creditors**<br><br>Debtors must attend the meeting to be questioned under oath. In a joint case, both spouses must attend. Creditors may attend, but are not required to do so. | **September 24, 2025 at 11:00 AM**<br><br>The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | **Location:**<br>Zoom video meeting. Go to Zoom.us/join. Enter Meeting ID 254 141 9096, and Passcode 3344089313, OR call (947) 214−5352.<br><br>For additional meeting information go to www.justice.gov/ust/moc. |
| **8.  Presumption of abuse**<br><br>If the presumption of abuse arises, you may have the right to file a motion to dismiss the case under 11 U.S.C. § 707(b). Debtors may rebut the presumption by showing special circumstances. | The presumption of abuse does not arise. | |
| **9.  Deadlines**<br><br>The bankruptcy clerk's office must receive these documents and any required filing fee by the following deadlines. | **File by the deadline to object to discharge or to challenge whether certain debts are dischargeable:**<br><br>**You must file a complaint:**<br>•  if you assert that the debtor is not entitled to receive a discharge of any debts under any of the subdivisions of 11 U.S.C. § 727(a)(2) through (7), or<br>•  if you want to have a debt excepted from discharge under 11 U.S.C § 523(a)(2), (4), or (6).<br><br>**You must file a motion:**<br>•  if you assert that the discharge should be denied under § 727(a)(8) or (9). | **Filing deadline: 11/24/25** |
| | **Deadline to object to exemptions:**<br>The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection. | **Filing deadline:** 30 days after the *conclusion* of the meeting of creditors |
| **10.  Proof of claim**<br><br>Please do not file a proof of claim unless you receive a notice to do so. | No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |
| **11.  Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. | |
| **12.  Exempt property** | The law allows debtors to keep certain property as exempt. Fully exempt property will not be sold and distributed to creditors. Debtors must file a list of property claimed as exempt. You may inspect that list at the bankruptcy clerk's office or register online at https://pacer.uscourts.gov. If you believe that the law does not authorize an exemption that the debtors claim, you may file an objection. The bankruptcy clerk's office must receive the objection by the deadline to object to exemptions in line 9. | |

# Exhibit E

**STATE OF MICHIGAN**

**CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

ZB VERIFIED INVESTMENTS                    NO. 2024-207081-CB
    Plaintiff,

V                                          HON. MICHAEL WARREN

KESSLER,ADAM,,
    Defendant.

## ORDER REGARDING MOTION

**Motion Title**: Plaintiff's Motion to Compel Defendants Kessler, Kaplan, and Divided Sky, LLC to Respond to Plaintiff's First Discovery Requests

**The above-named motion is:**        **Denied**

**In addition**: Having reviewed the Motion and Responses (inappropriately labeled Concurrence and Brief in Opposition), and otherwise being fully informed in the premises, the Court dispenses with oral argument as it would not assist in rendering a decision.  MCR 2.119(E)(3).

For the reasons articulated in the Response filed by Defendants Kessler, Kaplan, Divided Sky, LLC and Supply Line International LLC (the "Defendants"), the Motion is DENIED. Without limiting the foregoing, the Complaint only seeks monetary damages and not specific performance regarding the financial information. The Defendants have agreed to produce any not yet provided evidence that is relevant to the claims and relief sought in the Complaint.

In fact, if the Defendants admit that they breached the terms of the promissory note and breached the guarantees (which they all but do as it appears their central (if not sole) defense is usury), then discovery could be even more limited (i.e., limited to damages (if even necessary) and the usury defense.

Dated:  7/29/2024                          /s/ Michael Warren
                                           HON. MICHAEL WARREN
                                           CIRCUIT COURT JUDGE

# Exhibit F

ZB VERIFIED INVESTMENTS LLC,

     Plaintiff,

v.

ADAM KESSLER, JOSHUA KAPLAN, SAMI
AHMAD, DIVIDED SKY, LLC, SUPPLY
LINE INTERNATIONAL, LLC; SUPPLY
LINE INTERNATIONAL MEDICAL, LLC,
and JOHN DOES 1-10,

     Defendants.

and

ADAM KESSLER and JOSHUA KAPLAN,

     Cross-Plaintiffs,

v.

SAMI AHMAD,

     Cross-Defendant.

and

SAMI AHMAD,

     Cross-Plaintiff,

v.

DIVIDED SKY, LLC, ADAM KESSLER, and
JOSHUA KAPLAN,

     Cross-Defendants.

Case No. 24-207081-CB

Hon. Michael Warren

**DEFENDANTS DIVIDED SKY, LLC,
JOSHUA KAPLAN, AND ADAM
KESSLER'S BRIEF IN OPPOSITION
TO PLAINTIFF'S SECOND MOTION
TO COMPEL DEFENDANTS TO
RESPOND TO PLAINTIFF'S RE-
ISSUED DISCOVERY REQUESTS
AND PLAINTIFF'S SECOND
DISCOVERY REQUESTS**

Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
TAFT STETTINIUS & HOLLISTER
LLP
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
*Counsel for Plaintiff*

Thomas W. Cranmer (P25252)
Kimberly L. Scott (P69706)
Caroline B. Giordano (P76658)
MILLER, CANFIELD, PADDOCK
  AND STONE, P.L.C.
840 West Long Lake Rd., Suite 150
Troy, MI 48098
(248) 267-3381
cranmer@millercanfield.com
scott@millercanfield.com
giordano@millercanfield.com
*Counsel for Divided Sky, LLC, Supply Line
International, LLC, Supply Line International
Medical, LLC, Joshua Kaplan, and Adam Kessler*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Kelly E. Kane (P81912)
John J. McAllister (P84798)
Michael S. Lowe (*admitted pro hac vice*)
Callan G. Stein (*admitted pro hac vice*)
TROUTMAN PEPPER HAMLITON
   SANDERS LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300
Kelly.kane@troutman.com
John.mcallister@troutman.com
michael.lowe@troutman.com
callan.stein@troutman.com
*Counsel for Sami Ahmad*

**DEFENDANTS DIVIDED SKY, LLC, JOSHUA KAPLAN, AND ADAM KESSLER'S BRIEF IN OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL DEFENDANTS TO RESPOND TO PLAINTIFF'S RE-ISSUED DISCOVERY REQUESTS AND PLAINTIFF'S SECOND DISCOVERY REQUESTS**

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# INTRODUCTION

ZB knows it cannot justify serving **401** discovery requests and **35** third-party subpoenas aimed at invading every aspect of the Defendants' business and financial records, without any regard to whether those requests relate to the narrow set of disputed issues underlying its spurious claims. So, it attempts to mislead the Court as to the status of discovery, warping the facts to fit its contrived narrative of wrongdoing by Defendants. But ZB cannot fit a square peg into a round hole, and the Court should not turn a blind eye to ZB's continuing discovery abuses.

In attempting to justify its scorched earth discovery tactics, ZB omits that it ***has already received the documents*** it claims it needs. And its requests go far beyond the documents it claims it needs. For example, ZB claims it needs documents regarding the value of Verified Health. But ***none*** of its requests even mention Verified Health. And it has not issued a subpoena to Verified Health for that information. That is because ZB, who has an ownership interest in Verified Health, already has those records.

Similarly, ZB claims it needs documents related to the COVID-19 test kit program's financial performance. But ZB's claims do not relate to the entirety of the program. Rather, they reference specific alleged misrepresentations regarding the amount of money the program was earning from Medicaid and Medicare, spending on "affiliate marketing," and an investigation of Orchard (Sami Ahmad's company) by CMS. And ZB did not merely request documents related to the program, it requested every single financial record related to every single aspect of Divided Sky's business, and Kaplan and Kessler's finances, predating and post-dating the program.

Furthermore, Divided Sky has already produced documents pertaining to ZB's claims:

- Bank records and invoices reflecting where money (and, in particular, the loan funds) was spent on the Program;

- Records showing that Ahmad instructed Divided Sky to launch the Medicaid Program;

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Records showing the number of test kits delivered to Medicare and Medicaid beneficiaries;

- Records reflecting all of Divided Sky's revenues related to the Program;

- Emails showing that ZB was told *before the Promissory Note was executed* that "affiliate marketing" was *not* being used for the Program and that Medicare restricted using such marketing;

- Orchard's acknowledgement (through its counsel Callan Stein) that the CMS investigation pertained to Orchard's billing practices (not Divided Sky's business activities), there was no fraud, and Orchard owed money to Divided Sky under the Program;

- Records reflecting the outstanding amounts owed by Orchard under the Program; and

- All communications related to the Note, the Guaranty, the loan in general, the statements underlying ZB's fraud claims, and communications with ZB regarding the value of Verified Health.[1]

From the documents produced by Defendants, ZB can ascertain that each statement cited for ZB's fraud claims were true and no fraud occurred. But ZB and its counsel have always known the fraud claims were meritless because *ZB had these documents long before it filed its Amended Complaint.*

Finally, ZB misrepresents that the Court's prior Order allowing ZB to obtain records from Flagstar Bank allows it unfettered access to the Defendants' entire financial records. In reality, the Court merely allowed ZB to access the identities of the recipients of specific wire transfers related to the Program (which ZB already had at the time it opposed the Motion to Quash, despite its false representation otherwise). And the order did not change the Court's prior ruling that ZB is not entitled to financial records based on the terms of the Note or Guaranty when ZB has not brought a claim for equitable relief seeking documents from Defendants.

---

[1] Other than documents about the Note, Guaranty and loan proceeds, the documents in this list were produced in response to Sami Ahmad's first and second set of discovery requests which were tailored to the specific allegations from ZB's complaints and Ahmad's crossclaim.

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Because Divided Sky, Kaplan, Kessler, SLI, and SLIM have already produced discovery pertaining to ZB's claims and the remaining discovery requests are invasive and improper, the Court should deny ZB's Motion to Compel. Alternatively, the Court could potentially avoid the time and expense of resolving these discovery disputes by granting Defendants' pending Motion for Protective Order, staying discovery until the pending dispositive motions—which challenge the claims that ZB points to as the basis for its discovery requests—are ruled on.

## STATEMENT OF FACTS

***Orchard and Divided Sky developed and implemented an at-home COVID-19 test kit delivery Program.***

Orchard, Sami Ahmad's company, and Divided Sky developed and implemented a COVID-19 over-the-counter test kit delivery program ("Program") to provide a platform for Orchard's existing and future customers who were Medicare and Medicaid beneficiaries to order home delivery of Orchard-specified FDA-authorized OTC COVID-19 test kits. Orchard contracted with Divided Sky to purchase the specified kits and to perform related services for Orchard concerning the Program, including but not limited to distribution of the COVID-19 test kits and logistics, marketing, customer support, reporting and data analysis, financial management, and quality assurance. Divided Sky worked very closely with and at the direction of Ahmad and Orchard's General Counsel, Katranji, to try to make sure the Program was as successful as possible and compliant with and legal under CMS and other federal and state regulations. Orchard, on the other hand, had full and sole responsibility for billing CMS and Medicaid for the Program. And Orchard, as the party licensed with CMS and various states to submit Medicare and Medicaid billings, was solely responsible for ensuring the Program was compliant with CMS and other federal and state regulations. As a Medicare provider with an NPI number, Orchard was the only

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

contact with CMS and handled all aspects of the Medicare billing portion of the Program. Orchard was also the only contact and handled all aspects of the Medicaid billing portion of the Program.

In April 2023, Defendants and ZB began discussing whether ZB would issue a loan to be used for the Program. Ex. B, Text Messages. Defendants provided ZB with a description of the Program which made clear that the Program included both Medicare and Medicaid. See Am. Compl. at ¶¶ 12-16. Ahmad, as Orchard's CEO, reviewed and approved the statements, which were sent out on Orchard's behalf. Ex. A, Divided Sky's Rog. Resp. at No. 6. Before offering to loan to Divided Sky, ZB did its own research and due diligence on the Program, including speaking with Orchard and marketers.

Because ZB delayed in deciding whether to issue the loan, ZB was told that the loan needed to be deployed quickly—within 7 days—so that it could be used before Orchard stopped supplying test kits to Medicare beneficiaries under the Program. Ex. B, Text Message Conversations. Defendants never told ZB that they intended to use the loan for a sole purpose, and ZB never placed restrictions on the use of the loan funds. See ZB's Resp. to Defendants' MSD at 14, fn 1 (admitting that the "agreements are silent as to the purpose of the loan."). The parties did, however, discuss that the loan would be used to cover expenses for the Program, and in part for marketing. In an email, Divided Sky described one type of marketing as a "performance-based" strategy where marketers are paid based on the number of sales they generated. Ex. A, Divided Sky Rog Resp. at No. 3; see also Am. Compl. at ¶ 21 (selectively quoting this portion of the email). ***In the very next paragraph of that email,*** however, Divided Sky made clear that the Program was ***not*** using performance-based affiliate marketing and that "Medicare has strict rules around performance-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

based advertising." Ex. A, Divided Sky Rog Resp. at No. 3; ZBINV_000027-29 (produced by ZB).[2]

On April 27, 2023, Divided Sky executed the Promissory Note for $4.85 million. Am. Compl. at ¶ 30 and Ex. 1 to Am. Compl. In addition, Kaplan, Kessler, and Ahmad executed a personal Guaranty on April 27, 2023. *Id*. at ¶ 39; Ex. 2 to Am. Compl. ZB also received a 2.425% ownership interest in Verified Health, LLC, in connection with the loan. Am. Compl. at ¶ 28.

At Divided Sky's instruction and on behalf of Divided Sky, and with the knowledge and agreement of ZB, the loan proceeds were deposited with SLI. ZB agreed to this arrangement after drafting and requiring Divided Sky to sign the Acknowledgement attached to the Promissory Note. *Id*. at ¶ 97; Ex. 1 to Am. Compl.; Ex. N, SLI RFA Resp. at No. 1. Consistent with the strategy Divided Sky and ZB discussed previously, those funds were deployed within a "matter of days." See Am. Compl. at ¶ 70; Ex. N at No. 1.[3]

With Orchard's authorization, Divided Sky began fulfilling orders from Medicaid beneficiaries for COVID-19 OTC test kits. Between May 29, 2023 and July 22, 2023, Divided Sky processed more than 10,000 Medicaid orders and coordinated the shipment of more than 80,000 kits to Medicaid beneficiaries, for which it submitted to Orchard for billing and payment. Ex. A, Divided Sky Rog. Resp. at No. 6. At the end of July 2023 Orchard notified Divided Sky to cease distribution of COVID-19 OTC test kits to Medicaid beneficiaries. Sami Ahmad, as CEO of Orchard, told Divided Sky on multiple occasions that Orchard had submitted claims to Medicaid for the Program. It was not until 2024 that Orchard told Divided Sky that, contrary to Sami

---

[2] This document was designated as "confidential" by ZB. Divided Sky can provide a copy of the document upon the Court's request.

[3] ZB's claim that this deployment was contrary to what the parties previously agreed is demonstrably false based on the parties' written communications. Ex. B, Text Message Conversations.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Ahmad's previous representations, Orchard **had not** submitted claims to and received payments from Medicaid for the Program. Ex. O, Divided Sky's Response to Ahmad's RFA Nos. 31-33, 36.

Near the beginning of July 2023, Orchard informed Defendants that it received a letter about Orchard's billings to the Center for Medicaid and Medicare Services ("CMS"). See Ex. C, CMS Response Letter.[4] The letter called out a small percentage of perceived billing discrepancies. *Id*. This was the first time Defendants heard of any concerns from CMS about the Program. Defendants informed ZB of the letter within days after they were notified by Orchard. At ZB's request, Divided Sky drafted a memorandum about the CMS letter. Ex. D, July 2023 Memorandum to ZB.[5] Importantly, Defendants were not mentioned at all in the letter. See *id*. And although ZB has repeatedly suggested that Defendants are being investigated by the federal government (Mot. for Adjournment at ¶ 2), Defendants have not received a target letter and no criminal charges have been brought against Defendants.

On July 31, 2023, Orchard, through its counsel, Callan Stein, sent a letter responding to CMS. Ex. C, CMS Response Letter. In it, Orchard explained that no fraud occurred. *Id*. It took responsibility for the billing discrepancies that CMS flagged, and identified shipping errors that were the result of a third-party vendor (**not** one of the Defendants) failing to ship test kits that were ordered. *Id*. Orchard also informed CMS that it has outstanding payments owed to Divided Sky. *Id*. Orchard still owes Defendants at least $20 million related to the Program. *Id*. at No. 9. And, up until May 2024 (10 months after the Orchard ended the Program), Ahmad, as CEO of Orchard,

---

[4] Defendants filed a Motion to Seal on 12/6/2024 regarding the CMS Response Letter. Defendants will file this exhibit accordingly if the Court grants that motion.

[5] This Memorandum was generated by Divided Sky and ZB quoted from the content of this Memorandum in its Amended Complaint and based its claims on the content of this Memorandum. It contains no information about ZB. Thus, it cannot be considered confidential as to ZB under the parties' Stipulated Protective Order.

repeatedly told Divided Sky that Orchard still owed and would pay Divided Sky at least $20 million related to the Program. *Id.*

***ZB's new claims are based on a handful of discrete statements made during a three-month period; Defendants' responses to those allegations further narrow the scope of disputed issues.***

In its original Complaint, ZB asserted that Divided Sky breached the Note by "failing to pay ZB all amounts due on the Maturity Date." Am. Compl. at ¶ 36. It further claimed that Kaplan, Kessler, and Ahmad breached the Guaranty for the same reason. *Id.* at ¶ 42. Defendants asserted a usury defense in response. Answer to Compl. at ¶¶ 10, 23.

Despite ZB claiming that "nearly all of" Defendants' "representations concerning the financial performance of Divided Sky's business were false and/or omitted material facts," Mot. at ¶ 28, the new claims in its Amended Complaint are narrow and revolve around only a few alleged misrepresentations made during a short time period. However, these claims are largely contradicted by the very documents ZB relied on in making the allegations:

- **<u>Count III</u>** is a breach of contract claim against Kaplan and Kessler, asserting that they breached an "express representation and warranty" in the Guaranty. Am. Compl. ¶¶ 43-44. Kaplan and Kessler deny that they made any misrepresentation. Defendants have already produced documents about the negotiation of the representation. ZB did not seek any documents on this topic prior to the execution of the Guaranty or the maturity date of the loan.

- **<u>Count V</u>** is a fraud claim based a statement made in April 2023. ZB claims that Kaplan and Kessler "induced" it to loan Divided Sky money by representing that the loan was "going to be used to pay for 'affiliate marketing' costs[.]" *Id.* at ¶ 115. ZB claims this statement was untrue when it was made. *Id.* at ¶ 116. This is false. As shown by the very email ZB cites in its Amended Complaint, Defendants never represented that Divided Sky was going to use the loan to pay for performance-based "affiliate marketing," as ZB alleges. *Id.* at ¶¶ 21, 115-116; Ex. A, Divided Sky Rog. Resp. at No. 3. Moreover, in that same email, Divided Sky told ZB that "Medicare has strict rules around performance based advertising." ZBINV_000027-29 (produced by ZB).

- **<u>Count VI</u>** is a fraud claim based on statements made in five communications in May, June, and early July 2023. Am. Compl. at ¶ 124. Each statement pertained to the

amount the Program was generating or was projected to generate from Medicaid, or otherwise pertained to the deployment of and payment under the Medicaid Program. See *id*. The exceptions are one statement about the number of Medicare beneficiaries seeking test kits on April 25, 2023 (*id.* ¶ 46.a), representations about total revenue and net income generated from the Program (*id.* ¶ 46.a), and whether Divided Sky had disclosed that CMS was investigating Orchard (*id.* ¶ 124.g). Documents produced by Divided Sky and sworn discovery responses show that: (1) the statements about Medicaid having been launched were true (Ex. A, Divided Sky's Sworn Interrogatory No. 6); (2) statements about payment from Orchard for the Medicaid Program were true based on Orchard's assurances that it had been paid by Medicaid but which Divided Sky learned in May 2024 were false (*id.*); (3) the statements about test kit requests from Medicare beneficiaries on May 25, 2023, and the Program's revenue and net income were true; and (4) ZB was notified about the CMS investigation within days of Divided Sky learning about it. See Ex. D, Memorandum to ZB.

- **Count VII** is a fraud claim based on the statement by Kaplan and Kessler in April 2023 that Divided Sky was running "a legitimate, legal business." Am. Compl. at ¶ 131. ZB has argued that this statement was false, because it claims that the June 2023 CMS letter to **Orchard** "cites 'credible allegations of fraud' by the Kessler Defendants in their selling of COVID-19 test kits." *Id*. at ¶¶ 82-83, 131-132. This statement is unequivocally false—nothing in the letter supports ZB's baseless allegation that there was "credible allegations of fraud*"* by Kaplan, Kessler, or Divided Sky (which is likely why ZB neglected to attach the CMS Response Letter to its Amended Complaint). See Ex. C, CMS Response Letter. ZB omitted that Orchard (not Divided Sky) responded to the CMS letter on July 31, explaining that no fraud occurred and taking responsibility for the billing discrepancies that CMS flagged. *Id*. ZB had these documents at the time it filed its Amended Complaint, but intentionally misrepresented them. ZB's claim that it was not advised of the CMS investigation is similarly false. Defendants promptly informed ZB that CMS was looking into billing discrepancies shortly after it learned of the CMS Notice. See Ex. D, Memorandum to ZB.

- **Count VIII** is a conversion claim based on the same alleged statements referenced in Counts V-VII. In addition to the legal arguments advanced in Defendants' dispositive motion, Defendants rely on their responses to the allegations in Counts V-VII.

***The Court holds that ZB has no right to obtain unfettered access to Defendants' financial records and recognized that Defendants had properly produced responsive, relevant documents.***

After filing its initial Complaint, ZB issued 119 requests for production to Defendants, seeking far-reaching information on Defendants' financial assets. Defendants responded on July

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1, 2024, objecting to the overbroad and disproportional requests for financial records but agreeing to produce all of the documents related to the Note, the Guaranty, and the usury defense. ZB's Ex. 7 at RFP Nos. 33-40. Additionally, in response to Sami Ahmad's discovery requests, Defendants produced "documents sufficient to show that the Promissory Note proceeds were used for the OTC Testing Program," "nonprivileged documents that refer to or relate to the Loan at issue in this case," and communications that "refer or relate to the Promissory Note or Guaranty at issue in this case." See e.g., Ex. E, Divided Sky Resps. to Ahmad's First RFPs, at Nos. 1-3, 7-8, 10, 13; Ex. F, Divided Sky Resp. to Ahmad's Second RFPs at Nos. 1-3.[6] Additionally, despite ZB's false claim that Defendant failed to demonstrate where the loan money was spent, Motion at ¶ 25; Am. Compl. at ¶ 70, Defendants produced bank account records prior to ZB filing the Amended Complaint with the relevant transactions and correlated those entries to the Program's invoices, demonstrating where the money went. See Ex. A, Divided Sky Rog Resp. at No. 8.

Still, ZB filed its First Motion to Compel more responses to those requests. Ex. G, First MTC (without exhibits). Defendants argued in response that the majority of ZB's requests were abusive and improper given the claims and defenses at issue here. Ex. H, MTC Resp. Br. (without exhibits). They pointed out that the terms of the Note and Guaranty did not require them to provide the voluminous amount of personal financial information requested, and that Defendants already agreed to produce "all financial information provided to ZB pursuant to the terms of the Promissory Note." *Id*. Defendants further argued that ZB's extensive requests were improper under "well settled" Michigan law that "discovery of facts concerning a defendant's financial status, or

---

[6] ZB's suggestion that Defendants delayed in producing these documents is false. See Motion at ¶¶ 2-3. Defendants agreed to produce these documents from the outset, including in their first responses to discovery requests from ZB and Sami Ahmad. See Ex. H, Resp. to First MTC (without exhibits). In fact, ZB's first Motion to Compel was denied in part on that exact basis. Ex. I, 7/29/2024 Order.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

ability to satisfy a judgment," are impermissible "since such matters are not relevant." *Lotus Indus v Archer*, 2019 WL 4126558, at *1 (ED Mich Aug 30, 2019); accord *Bauroth v Hammoud*, 465 Mich 375, 376, 381; 632 NW2d 496 (2001) (reversing circuit court order allowing plaintiffs to discover "the net worth and/or assets and liabilities of Defendants" prior to the entry of any judgment on the ground that such information was neither "relevant to the subject matter" nor "reasonably calculated to lead to the discovery of admissible evidence").

This Court agreed with Defendants and denied ZB's Motion to Compel. Ex. I, 07/29/2024 Order. It specifically held:

> For the reasons articulated in the Response filed by Defendants Kessler, Kaplan, Divided Sky LLC, and Supply Line International LLC (the "Defendants"), the Motion [to Compel] is DENIED. Without limiting the foregoing, **the Complaint only seeks monetary damages and not specific performance regarding the financial information.** The Defendants have agreed to produce any not yet provided evidence that is relevant to the claims and relief sought in the Complaint. […] In fact, if the Defendants admit that they breached the terms of the promissory note and breached the guarantees (which they all but do as it appears their central (if not sole) defense is usury), then discovery could be even more limited (i.e., limited to damages (if even necessary) and the usury defense. (Emphasis added.)

***The Court allows ZB to obtain <u>some</u> of Divided Sky's financial records from Flagstar based on ZB's Amended Complaint.***

Based on the 7/29/2024 Order, Defendants filed a motion to quash a subpoena issued by ZB to Flagstar Bank, seeking some financial records pertaining to Divided Sky. Ex. J, Motion to Quash (without exhibits); Ex. K, First Flagstar Subpoena. ZB sought the identities of the recipients of specific, unredacted wire transfers in the bank account records that Defendants previously produced (even though it could already discern this from the invoices Defendants produced). Ex. K, First Flagstar Subpoena. Knowing it could not obtain these records based on the 7/29/2024 Order, ZB filed its Amended Complaint where it misrepresented that it did not know where the money was wired to from the bank account. See Am. Compl. at ¶ 70. It then opposed the Motion

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to Quash, stating the subpoena was relevant to (1) determining "where exactly the money ZB loaned went and to whom it went," and (2) exploring the value of Verified Health, which was relevant to the usury defense. Ex. L, Resp. to Motion to Quash (without exhibits). The Court denied the Motion to Quash based on this. See ZB's Ex. 11.

***Misrepresenting the Court's order on Defendants' Motion to Quash, ZB continues to propound wildly overbroad discovery requests seeking access to every aspect of Defendants' finances.***

After the Court entered its order on Defendants' Motion to Quash, ZB re-served the exact same requests that the Court previously held were improper attempts to seek specific enforcement of the Note and collect documents on post-judgment collections. Mot. at Exs. 4-6. ZB also issued: 63 requests for production and 7 requests for admission to SLI, 64 requests for production and 5 requests for admission to SLIM, and an additional 36 requests for production on Divided Sky. See Motion for Protective Order (attaching SLI and SLIM discovery requests); Mot. at Ex. 9.

In total, ZB has issued **401** requests for production to Defendants, SLI, and SLIM. These Requests demand an all-access pass to every aspect of Defendants' business and financial records, without regard to whether those records have anything to do with the claims or defenses in this case.[7] They seek records about businesses unrelated to the Program, for time periods beyond when the Program existed, outside the time when the loan was negotiated, and not tied to the specific alleged fraudulent representations listed in ZB's Amended Complaint (which relate to whether: loan funds were used for the Program (they were) or for "affiliated marketing" (they were not), Medicaid was included in the Program (it was), or if Defendants were accused of fraud by CMS (they were not)). For example, ZB requests:

---

[7] ZB has also issued **35** third party subpoenas, including 33 in the past month alone, containing the same kinds of overbroad requests for production.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Identification of and documents regarding any sources of income without any limitations (ZB's Ex. 4, Re-Served Kessler RFPs at Nos. 1-6, 31-32)[8];

- All documents regarding ownership of any personal property valued over $1,000, all real property, and all domains and intellectual property without any limitation or applicable time period (*id*. at RFP No. 7, 13, 29-30);

- All documents "regarding or reflecting" all payments of indebtedness without any limitation or applicable time period (*id*. at RFP Nos. 10-11);

- All documents "regarding or reflecting" all lawsuits or administrative proceedings Defendants have been involved in since 2021 without limitation (*id*. at RFP No. 12);

- All documents "regarding or reflecting" all corporate entities in which Defendants hold an interest without any limitation or applicable time period (*id*. at RFP Nos. 14-18);

- All documents "regarding or reflecting" all of Defendants' direct or indirect investments without any limitation or applicable time period (*id*. at RFP No. 19);

- Monthly financial account Statements and cancelled checks for all bank accounts without any limitation or applicable time period (*id*. at RFP No. 21-24);

- Every single communication between or among the Defendants, SLI, Ahmad, Orchard, or ZB, or to other parties referencing Defendants, SLI, Ahmad, Orchard, or ZB, regardless of the subject matter of the communication or when they were sent (*id*. at RFP Nos. 33-40);

- Every single payment made by one Defendant, SLI, or Orchard to another Defendant, SLI, or Orchard, regardless of the purposes or timing of the payment (*id*. at RFP Nos. 41-43);

- Every single document relating to the COVID test kit business in general, regardless of when the document was generated (ZB's Ex. 2 at RFP Nos. at 21-24, 27-33); and

- Information about the **individual Medicare and Medicaid recipients** who signed up to receive COVID testing (*id*. at RFP Nos. 25-26).

Importantly, none of ZB's requests mention Verified Health, were aimed specifically at understanding how the loan funds were expended, or were tailored to the specific allegations underlying ZB's fraud claims in its Amended Complaint.

---

[8] ZB asked for the same kinds of documents and information from Divided Sky, Kessler, Kaplan, SLI, and SLIM.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Defendants objected to these requests as overbroad and unduly burdensome. See, generally, Motion at Exs. 3, 7-9. Specifically, Defendants explained that the Court's 7/29/2024 Order prohibited ZB from obtaining discovery regarding post-judgment collections, and explained why that Order still applies. See e.g., ZB's Ex. 7, Resp. to RFP No. 1. But ZB refused to narrow its requests and maintains that it is entitled to every financial record generated by the Defendants.

## LAW AND ARGUMENT

### I. THE COURT'S ORDER DENYING THE MOTION TO QUASH DOES NOT GIVE ZB CARTE BLANCHE TO SEEK ALL OF DEFENDANTS' FINANCIAL RECORDS.

The Court already agreed with Defendants that well-established Michigan law prohibits ZB from taking discovery on the Defendants' net worth and/or assets and liabilities because such information is not relevant to the question of liability and because ZB did not bring a claim to obtain specific performance under the Note and Guaranty. Ex. H, MTC Resp. at pp. 5-6; Ex. I, 7/29/2024 Order (adopting argument in MTC Resp.). ZB argues that this Order no longer applies in part because the Court denied Defendants' Motion to Quash the Flagstar subpoena. ZB is incorrect. The Court's order on the Flagstar Subpoena did not grant ZB *carte blanche* to review every single financial document generated by the Defendants for at least the past four years.

The first Flagstar Subpoena requested information regarding the bank account entries identified by Divided Sky as showing who received money transfers relating to the Program. Ex. K, First Flagstar Subpoena. The Court agreed that information regarding these **specific transactions** was relevant to determine (1) how the loan money was spent (although ZB failed to disclose that it already had the means to determine this), and (2) the value of Verified Health. ZB's Ex. 11. But the requests at issue in this Motion are not limited to Program expenses and revenue; they seek financial records from **years** before the Program even began, and **months** after the Program concluded. And not a single request asks for information regarding the value of Verified

13

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Health or who has ownership interests in Verified Health. The Court's reasoning in denying the Motion to Quash simply does not apply to ZB's significantly broader requests at issue here.

Moreover, ZB already has the exact kinds of documents that the Court intended for them to obtain when it denied the Motion to Quash. It has information regarding the Program's revenues, expenses, and use of the loan proceeds. For each expenditure made for the Program, Divided Sky produced the bank account records showing how much money left the relevant bank account and when it was transferred out, and corresponding invoices showing how the money was used. Ex. F, Divided Sky RFP Responses to Ahmad at RFP No. 5 ("Defendant has produced invoices from the entities listed reflecting expenses incurred by Divided Sky for the OTC Testing Program and proof of payment of those expenses."). This includes both the loan and money Divided Sky received from Orchard.

ZB also received information regarding the value of an ownership interest in Verified Health before it acquired *its* ownership interest in Verified Health. ZB knows from those documents that Verified Health is a separate entity from Divided Sky and that it does not need to unturn every stone regarding Divided Sky's business to understand the value of Verified Health.

Defendants' objections to ZB's requests based on the Court's 7/29/2024 Order were, therefore, proper. Although ZB attempts to paint these objections as "boilerplate," they were the exact opposite—specific and detailed explanations of how the requests failed to comport with Michigan law and this Court's prior order. See, e.g., ZB's Ex. 7 Resp. to RFP No. 1; see also *Lucky v Detroit Prop Exch Co*, No. 2:19-CV-11122, 2020 WL 6118495, at *1 (ED Mich Oct 16, 2020) (describing a boilerplate objection as one that does not "specify[] how the discovery request is deficient" or "how the objecting party would be harmed if it were forced to respond to the request."). Had ZB crafted properly tailored requests, they would not have encountered these

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

objections. Indeed, Defendants provided detailed responses to Ahmad's interrogatories and requests for production specifically because his requests were, for the most part, reasonably tailored and proportional to the needs of the case. See e.g., Ex. A, E, F, O.

## II. ZB'S REQUESTS ARE WILDLY OVERBROAD AND PURPORT TO SEEK DOCUMENTS THAT HAVE ALREADY BEEN PRODUCED.

ZB filed its Amended Complaint specifically to avoid the Court's ruling that it was not entitled to an all-access pass to Defendants' financial records. And it now points to its Amended Complaint as a basis for its requests. But ZB may obtain discovery only "on any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case." MCR 2.302(B)(1). Critically, "Michigan's commitment to open and far-reaching discovery does not encompass fishing expeditions. Allowing discovery on the basis of conjecture would amount to allowing an impermissible fishing expedition." *Augustine v Allstate Ins Co*, 292 Mich App 408, 419–20; 807 NW2d 77 (2011) (internal citation and quotation marks omitted). The Court should not give ZB's speculative fishing expedition permission to cast off.

ZB separates its requests into three categories: "documents regarding the Kessler Defendants' finances;" "lawsuits or administrative proceedings to which each Defendant has been a party;" and communications between the Defendants, Ahmad, and/or Orchard Laboratories, including "documents regarding ZB's loan." Motion at ¶ 47. But ZB does not quote from any of its requests (because to do so would show how overbroad the requests are) and failed to explain how they are sufficiently tailored to obtain the documents ZB claims it needs. Moreover, ZB either already has received the requested documents through discovery or, in some cases, has not actually requested those documents.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**A.** **ZB should not be allowed to access every single financial record and business document held by the Defendants.**

ZB failed to provide a single legitimate reason why it is entitled to conduct the grossly overbroad and invasive review of Defendants' finances that it seeks. ZB does not need financial information regarding every aspect of the Program because its claims are not nearly that broad. Rather, ZB's claims specifically relate to: (1) how the loan funds they provided Defendants were spent (including if spent on "affiliate marketing"), (2) how much income the Program generated from Medicaid and Medicare reimbursements, (3) whether Medicaid was included in the Program, and (4) the scope of CMS's investigation into Orchard's billing practices and whether there was any fraud. But ZB has *already received in discovery documents on these topics*. Furthermore, ZB does not limit its requests to financial information about the Program. Its requests are intentionally broader, seeking financial records far outside the short time period from early 2023 through July 2023 when the Program was taking place. That ZB did not address this, or attempt to justify the breadth of its requests, is telling.

Instead of demonstrating how its requests comport with the allegations in its Complaint, ZB argues that the Guaranty or the Note permit it complete access to Defendants' finances. But the Court already rejected this argument in part because "the Complaint only seeks monetary damages and not specific performance regarding the financial information." Ex. I, 7/29/2024 Order. This did not change when ZB filed its Amended Complaint—ZB still seeks only monetary damages. Additionally, ZB's characterization of the parties' agreements is false. The Guaranty provides *warranties* regarding Kaplan's and Kessler's personal finances, but it does not require either to provide personal financial records. Nor did ZB conduct any such due diligence regarding their finances prior to executing the Promissory Note. And although the Note obligates Divided Sky to "provide financial statements, balance sheets and any other financial information as may

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

be requested by the Lender from time to time," Am, Compl. at Ex. 1, Divided Sky has already produced "all financial information provided to ZB pursuant to the terms of the Promissory Note." See ZB's Ex. 7. ZB does not deny that Divided Sky has already produced these records (indeed, ZB quotes from those documents in its Amended Complaint).

ZB alternatively argues that Count III of its Amended Complaint entitles it to all of Kaplan and Kessler's personal financial records. Resp. to Motion for Protective Order at p. 12. ZB's use of Count III is nothing more than an end-run around the Court's 7/29/2024 Order and the well-established rule that a claimant is not entitled to obtain records regarding a defendant's personal finances during the liability phase of a lawsuit. Count III was designed only to expand the scope of discovery to get around the Court's earlier ruling, as it does not entitle ZB to any additional remedies in this case. Even if this was proper (it is not), ZB's requests are not aimed at obtaining information sufficient to confirm that the value of Kaplan and Kessler's estate was at least $10 million during the pendency of the Guaranty. They instead seek every single financial record spanning *years* before the Guaranty was signed and months after the Program ended.

Finally, ZB argues that it needs the requested finances in order to determine the value of Verified Health as it relates to Defendants' usury defense. But none of ZB's requests actually seek information about Verified Health, and ZB has not served any subpoenas to Verified Health for that information, either. Knowing this, ZB argues that it needs financial information from Divided Sky to assess the value of Verified Health. Motion at ¶ 47. But this does not justify ZB's requests to Kaplan and Kessler. And the argument is also untrue because Verified Health is a separate entity from Divided Sky. Verified Health provided services to Divided Sky during the Program but that does not mean Verified Health's success is tied to Divided Sky. See Am. Compl. at ¶¶ 13-14. ZB knows this because *it owns an interest in Verified Health*. Furthermore, ZB already has

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

documents that show Verified Health's value at the time the Note was executed, as well as the expenditures and income from the Program. Put simply, anything more Defendants could produce on this topic would be duplicative of what ZB already has.

**B.  ZB's requests for information about the Defendants' liabilities are improper and based solely on ZB's unsupported conjecture.**

ZB's arguments that it needs information relating to other lawsuits or administrative proceedings the Defendants are parties to are similarly nonsensical.[9] ZB claims it needs these documents to determine Kaplan's or Kessler's net worth or identify their other creditors. But Kaplan and Kessler being involved in a lawsuit or administrative proceeding at some point in time would not inherently impact their net worth or mean that they have other creditors. And if this was really ZB's concern, it would not have needed to request every single document "regarding or relating to" every lawsuit and administrative proceeding they are engaged in. E.g., ZB's Ex. 4, Re-Served Kessler RFPs at No. 10. Moreover, the Court has already ordered that ZB is not entitled to this kind of discovery since ZB has not brought claims for equitable relief to obtain documents. 7/29/2024 Order. ZB has not, and cannot, justify its requests for every single document relating to every single lawsuit or administrative proceeding Defendants have been parties to since 2021.

These requests also have nothing to do with ZB's fraud claims or the value of Verified Health. ZB has not alleged that Defendants misrepresented or lied about involvement in any lawsuits or administrative proceedings. It is not entitled to take discovery on this topic merely because it is curious about whether such lawsuits exist. See *Augustine*, 292 Mich App at 419–20. Additionally, none of these requests relate to lawsuits or administrative proceedings involving

---

[9] Again, Defendants are not parties to the CMS investigation, or any administrative proceeding relating to that investigation. And they've not been identified as a target of any recent government investigations.

Verified Health. There is no reason that the debts or liabilities of Defendants would be attributed to Verified Health or impact Verified Health in any way.

Finally, ZB states that it wants to determine whether there is a "pattern of behavior by the Kessler Defendants" of "alleged forgery," Motion at ¶ 47. No one has claimed that Defendants committed forgery here—Ahmad **admitted** that he signed the Guaranty. See Ahmad Cross-Cl. at ¶ 28 (Ahmad "agreed to and **did execute** a personal guaranty for the $4,850,000 provided by ZB to [Divided Sky]."). Moreover, Divided Sky has already produced emails and text messages showing how it obtained Sami Ahmad's signature on the Guaranty.

### C. Defendants have produced all nonprivileged communications relating to the loan, the Note, the Guaranty, and the statements underlying ZB's claims.

The Court should not compel Defendants to produce additional communications "regarding and/or between Plaintiff, Kesler, Kaplan, Divided Sky, Supply Line, Ahmad, and/or Orchard Labs," Motion at ¶ 47, because Defendants, after conducting a reasonable search of their records, **already produced** all of the nonprivileged communications related to the Note, the Guaranty, the loan, and the specific alleged misrepresentations identified in ZB's Amended Complaint. That includes "communications regarding loan repayment and use of the monies Plaintiff loaned the Kessler Defendants" and "that reflect the transmission of unsigned and signed guarantees." *Id*. ZB is not entitled to anything more and otherwise provides no evidence suggesting that there are particular relevant documents that Defendants are withholding.

ZB argues that Defendants have "admitted" in their Initial Disclosures that communications related to other financing sources are relevant and discoverable. *Id*. This is false. Defendants have never "admitted" that communications regarding subjects completely unrelated to the loan, the Note, the Guaranty, or the allegations underlying ZB's claims are relevant because they are not. Rather, their Initial Disclosures referenced communications and documents related

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to the Note, the Guaranty, and the conveyance of membership interest in Verified Health. See Ex. M, Initial Disclosures at ¶¶ 4(a)-4(c), 4(g), 4(h), 5(b). Defendants have already produced all of the kinds of documents referenced in their Initial Disclosures. The fact that ZB has not obtained information substantiating its claims for fraud does not mean there are documents being improperly withheld—it means ZB's claims are meritless.

## CONCLUSION

ZB has either not reviewed any of the documents Defendants produced or is attempting to mislead the Court regarding the status of discovery, because it cannot seriously maintain that Defendants failed to produce documents evidencing how the loan funds were spent, the financial success of the Program, or relating to each statement that ZB relies on for its fraud claims. Nor has ZB attempted to defend the sheer breadth of its discovery requests. That is because the requests are not aimed at gathering documents related to the claims and defenses—ZB is attempting to gather financial information it can use for post-judgement collections. This is improper, no matter how ZB attempts to misrepresent the Court's order on Defendants' Motion to Quash.

For the reasons set forth above, Defendants respectfully request that the Court put an end to ZB's abusive discovery tactics and deny its Second Motion to Compel.

Respectfully Submitted,

By: */s/ Kimberly L. Scott*
Kimberly L. Scott (P6970)
Miller, Canfield, Paddock and Stone, P.L.C.
101 N. Main, 7th Floor
Ann Arbor, MI 48104
scott@millercanfield.com

Dated: December 9, 2024

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF filers of record.

By: */s/Kimberly L. Scott*
Kimberly L. Scott (P69706)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit G

**STATE OF MICHIGAN**

**CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

ZB VERIFIED INVESTMENTS                              NO. 2024-207081-CB
    Plaintiff,

V                                                   HON. MICHAEL WARREN

KESSLER,ADAM,,
    Defendant.

<u>ORDER REGARDING MOTION</u>

**Motion Title**: Plaintiff's Second Motion to Compel Defendants Kessler, Kaplan, and Divided Sky, LLC to Respond to Plaintiff's Re-Issued First Discovery Requests and Plaintiff's Second Discovery Requests

**The above-named motion is:**          **Denied**

**In addition**: Having reviewed the Motion and Response, and otherwise being fully informed in the premises, the Court dispenses with oral argument as it would not assist in rendering a decision.  MCR 2.119(E)(3).

For the reasons articulated in the Response, the Motion is DENIED. Without limiting the foregoing, the Court has already determined that the discovery requests at issue need not be answered. The Plaintiff has failed to show how the Amended Complaint changes the Court's rationale.

Dated:  12/12/2024                              /s/ Michael Warren
                                                HON. MICHAEL WARREN
                                                CIRCUIT COURT JUDGE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF:

JOSHUA ADAM KAPLAN

Chapter 7
Case No. 25−48523−tjt
Hon. Thomas J. Tucker

Debtor.

_____/

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 13, 2025, I electronically filed (1) Debtor's Response to ZB Verified Investments LLC's Motion for Order Directing Production of Documents and Oral Examination of Debtor, Joshua Adam Kaplan, and (3) Certificate of Service with Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Marc M. Bakst on behalf of Creditor Comerica Bank
mbakst@bodmanlaw.com, lstewart@bodmanllp.com

Jason W. Bank on behalf of Creditor CSC Capital Group, LLC
jbank@kerr-russell.com, nnajor@kerr-russell.com

Douglas C. Bernstein on behalf of Interested Party Oxford Bank
dbernstein@plunkettcooney.com, kwebster@plunkettcooney.com

Jeffrey H. Bigelman on behalf of Debtor Joshua Adam Kaplan
jhb_ecf@osbig.com, tc@osbig.com;mk@osbig.com

Tracy M. Clark on behalf of Trustee Homer W. McClarty
clark@steinbergshapiro.com

Kimberly Ross Clayson on behalf of Creditor ZB Verified Investments LLC
kclayson@taftlaw.com,
ttorni@taftlaw.com;DET_Docket_Assist@taftlaw.com;TStorm@taftlaw.com

Cheryl Cook on behalf of Creditor Mercedes-Benz Vehicle Trust
bknotices@potestivolaw.com, cdcooklaw@gmail.com

Robert J. Diehl, Jr. on behalf of Creditor Comerica Bank
rdiehl@bodmanlaw.com

Danielle Love on behalf of Creditor CSC Capital Group, LLC
dkus@kerr-russell.com

Homer W. McClarty
trustee@morganmcclarty.com,
MI34@ecfcbis.com;hwm1@trustesolutions.net;annbrewer632@gmail.com

Todd J Ruchman on behalf of Creditor JPMorgan Chase Bank, N.A.
amps@manleydeas.com

Molly Slutsky Simons on behalf of Creditor JPMorgan Chase Bank, N.A.
amps@mdklegal.com

<table>
<tr><td></td><td>Respectfully submitted,<br>**OSIPOV BIGELMAN, P.C.**</td></tr>
<tr><td>DATED: November 13, 2025</td><td>*/s/ Jeffrey H. Bigelman*<br>JEFFREY H. BIGELMAN (P61755)<br>Attorneys for Debtor<br>20700 Civic Center Drive, Suite 420<br>Southfield, MI 48076<br>Tel: 248-663-1800/Fax: 248-663-1801<br>jhb@osbig.com</td></tr>
</table>